| | | |
|---|---|---|
| **LINDA CARTER** | * | **IN THE UNITED STATES** |
| *Plaintiff,* | * | **DISTRICT COURT FOR** |
| v. | * | **THE DISTRICT OF MARYLAND,** |
| **STATE OF MARYLAND,** *et al.* | * | *BALTIMORE DIVISION* |
| *Defendants.* | * | |
| | * | Case Number: JKB-12-cv-1789 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
RESPECTIVE RULE 12(B)(6) MOTIONS TO DISMISS**

*If we are to keep our democracy, there must be one commandment: Thou
shalt not ration justice.*

– Judge Learned Hand

*Intentionally Blank*

## PRELIMINARY STATEMENT

*If it means interfering in an ensconced, outdated system, to help just one*
*woman, man, or child…I'm willing to accept the consequences.*

–Wonder Woman #170

This Preliminary Statement starts with a quote from Wonder Woman. While perhaps unconventional, it nicely sums up Plaintiff Linda Carter's Amended Complaint and her motivations for prosecuting her claims against the Defendants. But there is also another reason, as you may have noticed, our Plaintiff shares her name with the American actress, singer, and star of the 1970s television series *The New Original Wonder Woman* and *The New Adventures of Wonder Woman.* And it undoubtedly is for this reason that following the news media's publication of the story of how our Ms. Carter was crippled by the Defendants' use of electromagnetic energy, she became known by the moniker "*The Wanded Woman.*"

Ms. Carter brought the present action against the Defendants, pursuant 42 U.S.C. § 1983, for violations of her rights to access the courts, arising under the Fourteenth Amendment to the United States Constitution, for violations of the Americans with Disabilities Act of 1990 (*hereinafter,* the "ADA") and Section 504 of the Rehabilitation Act of 1974 (*hereinafter,* the "Rehab. Act"), both as amended, violations of the Maryland Declaration of Rights Articles 19 and 24, and for common-law torts arising under the laws of Maryland.

Ms. Carter alleges - and will prove with discovery and at trial - that deputy sheriffs, courthouse security officers, and their superiors (*hereinafter,* "Court Security") at the Circuit Court for Baltimore City denied her access to the courts by subjecting her neuro-transmitter device to electromagnetic fields at various security checkpoints. In so doing, Court Security based their decisions solely upon their knowledge of the Plaintiff's disability. Court Security's actions were neither random nor isolated, but were instead part of a pattern and practice that encourages and requires Court Security to deny access to the courts *inter alia* by turning a blind eye to their obligation to reasonably accommodate disabled visitors. That pattern and practice, in turn, was part of a larger conspiracy among the Defendants to deprive disabled visitors of the Circuit Court for Baltimore City of their constitutional rights to access the courts.

Now, the Defendants, individually and collectively, have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Ms. Carter's Amended Complaint for failure to state a claim upon which relief may be granted and based on various alleged governmental immunities. Because the Defendants' respective Motions raise similar - and in some instances, virtually identical -

points of fact and law, in the interest of avoiding burdening this Honorable Court with repetitive briefing papers in opposition to what are in sum and substance similar arguments, the Plaintiff respectfully submits this Omnibus Memorandum of Law in Response to the Defendants' Respective Rule 12(B)(6) Motions to Dismiss.

**STATEMENT OF FACTS**

A few years ago, Ms. Carter had a neuro-transmitter device surgically implanted in the mid-thoracic region of her spine to manage the pain caused by her disability.[1] This device is designed to help control the severe back and leg pain from which she suffers by electronically interrupting the pain impulses sent to her brain.[2]

Prior to the events giving rise to Ms. Carter's Amended Complaint, she was issued a disability identification card requiring alternate security screening to protect her mid and lower back from exposure to any electromagnetic fields produced by devices such as metal detectors or metal detecting wands.[3]

It should be well known by Court Security that electromagnetic fields interfere with the operation of neuro-transmitting devices such as the one implanted in Ms. Carter's back and can cause serious, if not fatal, injuries if there is exposure.[4] And, as communicated hereinafter, Court Security was both aware of Ms. Carter's disability, their duty to accommodate her, and which accommodation was necessary and why.

This past year, divorce proceedings were initiated by Ms. Carter in the Circuit Court for Baltimore City.[5] And on or about November 17, 2011, upon entering the Circuit Court for Baltimore City through the Calvert Street entrance for a scheduling conference, Ms. Carter presented her medical identification card to Court Security, John Doe 1.[6] She explained that she is disabled and that she needed alternate security screening because she has an implanted medical device that cannot be subjected to the electromagnetic fields emitted from metal detectors or metal detecting wands.[7]

---

[1]   Amended Complaint at ¶ 26.

[2]   *Id.*

[3]   *Id.* at ¶ 27.

[4]   *Id.*

[5]   *Id.* at ¶ 28.

[6]   *Id.* at ¶ 29.

[7]   *Id.*

Despite Ms. Carter's requests for alternate screening and the presentation of her disability identification card, John Doe 1 insisted under the color of law that she squeeze around the metal detector, rather than giving her alternate screening – a path which exposed her to electromagnetic fields.[8] And, while in route, Ms. Carter experienced an electric shock in her back unlike anything she had ever felt before.[9] The extreme pain caused her to collapse. However, despite Ms. Carter's collapse, Court Security continued to screen additional visitors and failed to provide her with any assistance, including contacting emergency medical services.[10]

Thereafter, on or about March 28, 2012, upon entering the Circuit Court for Baltimore City through the Fayette Street entrance for a hearing before the Honorable Yvette Bryant, Ms. Carter again presented her medical identification card to Court Security, John Doe 2.[11] She explained that she had a disability that requires alternate security screening because she has an implanted medical device that cannot be subjected to the electromagnetic fields emitted from metal detectors or metal detecting wands.[12] Ms. Carter additionally informed John Doe 2 of her experiences with Court Security on November 17, 2011.[13]

John Doe 2 appeared to appreciate Ms. Carter's disability and corresponding limitations.[14] He assured her that she would be patted down and not subjected to any security screening that involved a metal detector or metal detecting wand.[15] Ms. Carter proceeded to the screening area adjacent to John Doe 2 without incident, where she was introduced to John Doe 3.[16]

Ms. Carter began explaining to John Doe 3 that she is disabled and that she cannot be exposed to electromagnetic fields, including a metal detecting wand.[17] John Doe 2 joined Ms. Carter's explanation and informed John Doe 3 that he had already seen her medical identification card and that she was to receive a disability accommodation in the form of a policy modification – a security pat-down with no

---

[8]  *Id.* at ¶ 30.

[9]  *Id.*

[10]  *Id.*

[11]  *Id.* at ¶ 31.

[12]  *Id.*

[13]  *Id.*

[14]  *Id.* at ¶ 32.

[15]  *Id.*

[16]  *Id.*

[17]  *Id.* at ¶ 33.

metal detector or metal detecting wand.[18] John Doe 3 agreed.[19]

Pursuant to John Doe 3's instructions, given under the color of law, Ms. Carter lifted her arms in the air for a security pat-down.[20] However, suddenly and without warning, John Doe 3 grabbed a metal detecting wand and stated that "it is policy."[21] With that, he ran the metal detecting wand down Ms. Carter's back. [22] And again, Ms. Carter was electronically shocked and collapsed.[23] Though, this time the shocking didn't stop. As Ms. Carter discovered when she was finally able to stand, with each step she took, she experienced an extreme and debilitating electronic shock.[24] Through all Ms. Carter's pain and suffering in and around Court Security, they kept screening more visitors and never offered her any assistance, including contacting emergency medical services.[25]

Ms. Carter very slowly proceeded to her hearing, getting shocked repeatedly along the way.[26] When she arrived, the Honorable Yvette Bryant called an ambulance and gave Ms. Carter some advice about how to address her injuries – "Get a lawyer!"[27]

To say that Ms. Carter was denied access to the courts or that she experienced disability discrimination are both probably understatements. She describes the pain she experiences from her neuro-transmitter since being wanded "as feeling like she has been hit by a taser."[28] And, what is worse, the "tasing" only stops when Ms. Carter is not engaged in activities that require the use of her legs.[29]

Congress enacted Title II of the ADA, now amended, to protect individuals with disabilities and individuals perceived to have disabilities from violations of their fundamental rights and liberties by state and local governments. Title II provides that:

---

[18] *Id.*

[19] *Id.*

[20] *Id.* at ¶ 34.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.* at ¶ 35.

[27] *Id.*

[28] *Id.* at ¶ 36.

[29] *Id.*

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity.[30]

Congress sought in Title II to address its explicit finding that:

> [D]iscrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services.[31]

Within these areas, individuals with disabilities have constitutional rights *inter alia* arising under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The Due Process Clause incorporates most of the guarantees of the Bill of Rights and encompasses state and municipal conduct subject to constitutional limitations embodied in the First, Fourth, Fifth, Sixth, and Eighth Amendments.[32] The legislative record confirms that when Congress enacted Title II, it was concerned with due process violations, such as inaccessible courthouses and the infringement of individuals' with disabilities rights to participate in judicial proceedings.

Many courts, including the Supreme Court of the United States of America, have held that the Due Process Clause guarantees access to judicial proceedings. Inaccessible courtrooms and courtrooms closed to the public potentially violate the rights of both individuals with disabilities and the general public. Title II serves to prevent these constitutional violations.

Ms. Carter's experiences with Court Security foreclosed on her right to access the courts and violated her clearly established rights arising *inter alia* under the ADA, the Rehab. Act, the common law of Maryland, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Articles 19 and 24 of the Maryland Declaration of Rights. In sum, Ms. Carter's Amended Complaint seeks redress for the deprivation of her rights and to punitively shock the Defendants into compliance with well settled federal and state law.

---

[30]   42 U.S.C. § 12132 (2003).

[31]   42 U.S.C. § 12101 (a)(3).

[32]   *See Duncan v. Louisiana*, 391 U.S. 145, 148 (1968).

## ARGUMENT

A motion to dismiss under the Federal Rules of Civil Procedure Rule 12(b)(6) serves to test the legal sufficiency of a complaint, but "does not resolve contests surrounding the facts, merits of a claim, or the applicability of defenses."[33] "When ruling on a 12(b)(6) motion, the court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's factual allegations, as well as all reasonable inferences therefrom, as true."[34] Specifically, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that the plaintiff is entitled to no relief under any set of facts which could be proved in support of the claim."[35]

I.    **THE ADA, THE REHAB. ACT, THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND ARTICLES 19 AND 24 OF THE MARYLAND DECLARATION OF RIGHTS ALL PROTECT MS. CARTER'S RIGHTS TO ACCESS THE COURTS – ALL OF WHICH WERE VIOLATED BY THE DEFENDANTS.**

The American legal system promises equality in the administration of justice. Since the beginning of the Republic, we have aspired, as John Adams urged, to be "a nation of laws, not men."[36] Evidence of this promise appears throughout our founding documents. The Fifth and Fourteenth Amendments to the United States Constitution guarantee protection of the laws and due process. Maryland's Declaration of Rights requires the administration of "justice and right, freely without sale, fully without denial, and speedily without delay, according to the law of the land." Even the edifice of the Supreme Court re-enforces the aspiration. "Equal Justice Under Law" is proudly inscribed above the entrance through which each litigant passes on their way to into the courthouse.

The barriers to equal access to justice are real and plentiful, and for persons historically disenfranchised, are often insurmountable. Such barriers for persons with disabilities literally keep the majority of them out of court.

As noted *supra,* Title II of the ADA became effective on January 26, 1992, and provides as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

---

[33]   *Gray v. Maryland*, 228 F. Supp. 2d 628, 635 (D. Md. 2002).

[34]   *Gray*, 228 F. Supp. 2d at 635.

[35]    *Kennedy v. Widdowson*, No. R-90-3018, 1991 WL 334826, at *1 (D. Md. June 20, 1991).

[36]   Massachusetts Constitution (1780).

discrimination by any such entity.[37]

This provision is "intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability."[38] It "guards against both intentional discrimination and simple exclusion from services resulting not from intentional discriminatory acts, but rather from inaction, thoughtlessness, or equal treatment when particular accommodations are necessary."[39]

> The statute's language demonstrates a recognition by Congress that discrimination against persons with disabilities differs from discrimination on the basis of, for example, gender, or race. Discrimination in the latter instances has been judicially defined as disparate treatment on the basis of a certain characteristic that identifies an individual as a member of a protected class. However, a person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation. In the context of disability, therefore, equal treatment may not beget equality, and facially neutral policies may be, in fact, discriminatory if their effect is to keep persons with disabilities from enjoying the benefits of services that, by law, must be available to them.[40]

A "qualified individual with a disability" is broadly defined as any person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[41] The term "public entity" is defined to be "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[42] It has been said "that the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does."[43]

---

[37]   42 U.S.C. § 12132.

[38]   *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir.1996).
[39]   *Presta v. Peninsula Corridor Joint Powers Board*, 16 F.Supp.2d 1134, 1135 (N.D.Cal.1998).

[40]   *Id.* (citation omitted). *See also Crowder*, 81 F.3d at 1483–84 ("Few would argue that architectural barriers such as stairs, or communication barriers such as the preference for the spoken word, are intentionally discriminatory. Yet, stairs can deny the wheelchair-bound access to services provided on the second floor of a government building; and communicating only by the spoken word can deny deaf persons the ability to find out that it is the second floor where they must go to obtain the services they seek.").

[41]   42 U.S.C. § 12131(2).

[42]   42 U.S.C. § 12131(1).

[43]   *Johnson v. City of Saline*, 151 F.3d 564, 1998 WL 442669, *5 (6th Cir. Aug.6, 1998).

Section 504 of the Rehabilitation Act, which became effective in 1973, provides:

> No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....[44]

The phrase "program or activity" is defined to include "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government."[45]

"The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable.' "[46]

To effectuate the statutory mandates of the ADA, the Department of Justice, under the authority of 42 U.S.C. § 12134(a), promulgated regulations regarding the responsibilities of state and local governments to disabled persons. In view of the express delegation, the regulations are entitled to "controlling weight, unless they are arbitrary, capricious, or manifestly contrary to the statute."[47] The regulations state that "a public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[48]

To establish a violation of either Act, the plaintiff must demonstrate: "1) she is a qualified individual with a disability; 2) she was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and 3) that such exclusion, denial of benefits, or other discrimination, was by reason of her disability."[49]

In this case, it is undisputed that Ms. Carter has a disability within the meaning of these Acts, that the State of Maryland and the Mayor & City Council are public entities which receive federal assistance, and that chancery court proceedings are services within the meaning of the Acts. Further, it is undisputed that Court Security was fully aware of Ms. Carter's qualified disability and that they did

---

[44]   29 U.S.C. § 794.

[45]   29 U.S.C. § 794(b).

[46]   *Gorman v. Bartch*, 152 F.3d 907, 1998 WL 498601, *4 (8th Cir. August 20, 1998) (quoting, *Allison v. Department of Corrections*, 94 F.3d 494, 497 (8th Cir.1996)).

[47]   *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

[48]   28 C.F.R. § 35.150(a).

[49]   *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir.1998). *See also Gorman v. Bartch*, 152 F.3d 907, 1998 WL 498601 (8th Cir. Aug.20, 1998).

not provide her with appropriate alternate screening and, as alleged by Ms. Carter, the exclusion, denial of benefits, and other discrimination was made by reason of her disability.[50]

The Department of Justice Technical Assistance Manual for Title II, in discussing the concept of program accessibility, provides a helpful illustration, which involves an analogous situation. Specifically, illustration 2 to II–5.1000 provides as follows:

> D, a defendant in a civil suit, has a respiratory condition that prevents her from climbing steps. Civil suits are routinely heard in a courtroom on the second floor of the courthouse. The courthouse has no elevator or other means of access to the second floor. The public entity must relocate the proceedings to an accessible ground floor courtroom or take alternative steps, including moving the proceedings to another building, in order to allow D to participate in the civil suit.

It is likely true that a defendant with a respiratory condition may be able to eventually make it up a flight of stairs. It is also likely true that a disabled shopper with a disability tag on their motor vehicle may be able to park 300 feet away from designated disability parking and still eventually make it to a store's entrance. But that isn't the point. The point is that there are millions of Americans that are disabled and that as a civilized society we provide them with reasonable accommodations so that their disability does not have the effect of precluding them from participation in certain activities.

To further illustrate the point that it is not enough for a disabled person to arrive at a destination, regardless of how they got there, courthouses with a second floor must be accessible by a ramp or elevator.

> [C]arrying an individual with a disability is considered ineffective and therefore an unacceptable method for achieving program accessibility.
>
> Carrying is permitted only in manifestly exceptional cases, and only if all personnel who are permitted to participate in carrying an individual with a disability are formally instructed on the safest and least humiliating means of carrying. "Manifestly exceptional" cases in which carrying would be permitted might include, for example, programs conducted in unique facilities, such as an oceanographic vessel, for which structural changes and devices necessary to adapt the facility for use by individuals with mobility impairments are unavailable or prohibitively expensive. Carrying is not permitted as an alternative to structural modifications such as installation of a ramp or a chairlift.[51]

The Defendants, however, seem to miscomprehend that a disabled visitor who has warned Court Security about their sensitivity to electromagnetic fields and requested a reasonable accommodation is

---

[50]  *See* Statement of Facts; Amended Complaint at 74.

[51]  Appendix A to 28 C.F.R. § 35.150(b)(1).

actually due a reasonable accommodation irrespective of whether the disabled visitor ultimately reaches their desired destination. The Defendants state:

> It is quite obvious from the plain read of the allegations of the Amended Complaint that the Deputy Sheriffs did, in fact, allow the Plaintiff access to the Circuit Court for Baltimore City and did not exclude her or deny her any benefits whatsoever.

> …Plaintiff complains that by not being allowed to have alternate screening, she was still exposed to electromagnetic fields, which is absolutely irrelevant under Title II because the issue is whether or not she was denied access to the Circuit Court for Baltimore City.[52]

The Defendants are confusing Ms. Carter's Fourteenth Amendment right to access the courts and her rights arising out of Articles 19 and 24 of the Maryland Declaration of Rights to access the courts with her rights arising under the ADA and the Rehab. Act to an accommodation for her disability, the denial of which has the effect of denying her access to the courts. Such access to the courts and reasonable accommodations for Ms. Carter's disability, however, are not to be interpreted as mere physical access, but rather include the opportunity to participate in the activities of the court. Ms. Carter was so badly injured by the actions of Court Security that an ambulance had to be called and she was instructed by the head Family Court judge to get a lawyer. This is neither access nor participation.

## II. THE DEFENDANTS ARE NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY.

The Eleventh Amendment to the United States Constitution protects the sovereign rights of states from abridgement by the federal judiciary, exempting states from suit in order to protect their treasury and to uphold respect for their status as sovereigns.[53] [54] Since states enjoy sovereign immunity, state officials and agencies acting as an "arm of the state" are also immune from a suit for damages in federal court as long as they act in their official representative capacities on behalf of the state.[55] However, state sovereignty does not prevent the courts from examining whether the state has complied with federal law.[56] Nor does Eleventh Amendment immunity extend to counties, municipalities, or local

---

[52]   Motion to Dismiss at 16.

[53]   *See N. Ins. Co. of N.Y. v. Chatham County, Ga.,* 547 U.S. 189, 192 (2006).

[54]   The Eleventh Amendment provides that: The Judicial Power of the United States shall not be construed to extent to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

[55]   *Harter v. Vernon,* 101 F.3d 334, 336 (4th Cir. 1996).

[56]   *Alden v. Maine,* 527 U.S. 706, 755 (1999).

government entities and employees even if they exercise a measure of state power.[57] While a federal court may look to state law in determining the character and status of agencies and individuals, it is ultimately an issue of federal law whether a defendant is an arm of the state.[58] But, even if a federal court determines that an agency or official is a state for purposes of the Eleventh Amendment, such a state actor may still not be entitled to immunity if: 1) a state or state actor's immunity was directly abrogated by Congress through Article Five of the Fourteenth Amendment, or 2) if a state or state actor waived immunity by expressly consenting to a suit, or 3) if there is an ongoing violation of federal law and the suit is seeking prospective relief against a state official in his/her official capacity.[59]

A.    COURT SECURITY ARE NOT STATE ACTORS FOR PURPOSES OF ELEVENTH AMENDMENT IMMUNITY.

    Whether a defendant is a state actor for purposes of Eleventh Amendment immunity is a question of federal law.[60] When a defendant claims immunity under the Eleventh Amendment or states that he is not a "person" under § 1983, he bears the burden of proving that he is a state official.[61] In determining whether a defendant has met their burden of proof, the United States Supreme Court has cautioned that federal courts ought to examine the actual functions of the state entity rather than its nominal classification under state law.[62] To that end, the Fourth Circuit has long established a four-factor test that ignores the label a state may affix upon an entity and instead critically evaluates the substantive relationship between the state and the entity. This four-factor test examines: 1) whether the state treasury will be responsible for paying any judgment that might be awarded; 2) whether the entity exercises a significant degree of autonomy from the state; 3) whether the entity or official is involved with local concerns rather than statewide concerns, and 4) how the state treats the agency or actor as a matter of state law.[63] Because the United States Supreme Court has found that respect for state sovereignty and protection of state treasuries are generally the two governing purposes for the Eleventh Amendment, the Fourth Circuit has generally held that if a defendant can prove under the first prong of

---

[57]    *Harter, 101 F.3d at 336; N. Ins. Co. of N.Y.,* 547 U.S. at 193-94.

[58]    *Ram Ditta v. Md. Nat'l Capital Park and Planning Comm'n,* 822 F.2d 456, 459-60 (4th Cir. 1987).

[59]    *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976); *Edelman v. Jordan,* 415 U.S. 651, 673 (1974); *, Ex parte Young,* 209 U.S. 123 (1908).

[60]    *See Ram Ditta,* 822 F.2d at 458.

[61]    *Kennedy,* 1991 WL 334826 at *3.

[62]    *See McMillian v. Monroe County,* Ala., 520 U.S. 781, 786 (1997) (holding that determining whether a sheriff is a state officer for purposes of establishing liability under § 1983 partially depends on examining the sheriffs actual function).

[63]    *Ram Ditta,* 822 F.2d at 457-58.

the *Ram Ditta* test that payment out of the state treasury will be made to satisfy a judgment, the defendant will be immune from suit and the remaining three factors need not be analyzed.[64] Conversely, if the court finds that payment will not be made out of the state treasury, it weighs against a finding of immunity.[65]

In holding that a North Carolina sheriff in his official capacity was not a state official under federal law and, therefore, not shielded from suit under the Eleventh Amendment, the Fourth Circuit decision in *Harter v. Vernon,* represents a textbook example of a *Ram Ditta* analysis.[66] First the Court analyzed whether the state treasury would be responsible for payment of funds for damages against the sheriff. Concluding that the judgment would not be paid out of state funds, the court next examined the remaining three factors of the four-factor test.[67] Under the second factor regarding the degree of the sheriffs autonomy from the state, the court found, among other things, that, while the State Constitution created the sheriffs office and the sheriffs term of office and qualifications were set by state statutes, counties had a substantial control over the sheriffs including the fact that county residents voted for the sheriff, the Board of County Commissioners set the sheriffs office salaries and had the power to appoint a new sheriff in case of removal or resignation.[68] Under the third factor regarding the sheriffs involvement with local as opposed to statewide concerns, the Court noted that although sheriffs are involved in state concerns in upholding state law and performing multiple duties for the state, a sheriff is elected by the county, is responsible to the county, and performs law enforcement for the county.[69] Finally, under the fourth factor, concerning how a sheriff is treated as a matter of state law, the court explained:

> Some cases have mistakenly treated a state court decision as to whether an entity is a state actor as determinative. As a matter of federal law, a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question. A federal court may "give deference to the rationale used by a state court," but the holding is not dispositive as a matter of federal law.[70]

---

[64]  *Gray v. Laws,* 51 F.3d 426, 433-34 (4th Cir. 1995).

[65]  *Harter*, 101 F.3d at338.

[66]  101 F.3d 334 (4th Cir. 1996),

[67]  *Harter,* 101 F.3d. at 339, 340.

[68]  *Id.* at 340-41.

[69]  *Id.* at 341, 342.

[70]  *Id.* at 342. (internal citations omitted).

Here, under the *Ram Ditta* analysis, Court Security are not state actors. First, Court Security is created within the Sheriff's Office of Baltimore City by the Baltimore City Charter.[71] And the Sheriff is the Chief of Court Security.[72] The Mayor & City Council have the same power with respect to the salaries of Court Security that they do under the Charter with respect to all municipal departments.[73] Further, Court Security is authorized under the Charter to carry weapons and wear uniforms.[74] And the salaries of Court Security, together with funds necessary to provide uniforms, equipment, supplies, and general expenses are included in the annual operating budget requests of the Sheriff of Baltimore City as provided in the Annual Ordinance of Estimates of the Mayor and City Council of Baltimore City.[75] Additionally, Court Security is required by law to have a have bonds and sureties for the protection of the public against official misconduct and to protect the state treasury from liability for damages.[76]

The Mayor & City Council exercise a significant degree of control over Court Security since they have the final say over Court Security's employment, compensation, and the Sheriff of Baltimore City's election, and provide Court Security with all necessary expenses in order for them to carry out their duties.[77] Moreover, Court Security is responsible for law enforcement matters within the confines of Baltimore City rather than statewide concerns, as Baltimore City does not have an independent law enforcement agency of its own that polices the Baltimore City Circuit Court or an agency that's primary function is to serve warrants. And even though Court Security is responsible for carrying out state law as dictated by common law, their duties are shared by all law enforcement personnel within the State of Maryland. To conclude that because Court Security, who are also vested with duties of enforcing state law, are considered state officials for that reason is erroneous. Lastly, Maryland's characterization of a sheriff and his deputies is not dispositive for federal purposes. Although Maryland law states that a

---

[71]   § 22-6.

[72]   *Id.*

[73]   § 22-7.

[74]   § 22-10.

[75]   § 22-11.

[76]   Md. Const. art. IV, § 44; *See Harford County v. University of Maryland Medical System Corp.*, 569 A.2d 649, 650 (Md. 1990) (holding that the county was responsible for payment of medical costs for injuries caused by sheriff during arrest since the expenses of a sheriff's office are paid by the county, as required by Maryland law).

[77]   Md, Code, Ann., Cts & Jud. Proc. § 2-309; Md Const. art. IV, § 44; Md. Code Ann., Cts. & Jud. Proc. § 2-309(a-1).

sheriff is a state actor for state purposes, it is the actual function of the sheriff and/or his deputies rather than their characterization that is important.[78] For all intents and purposes, Court Security acted as a Baltimore City rather than a state official. However, even if Court Security are considered state officials, it does not preclude a finding that they were also acting as Baltimore City employees in various circumstances.

This Court should find as it did in *Kennedy* in holding that the Court Security has not properly supported their burden of showing that they are, in fact, state officials as a matter of federal law in order to claim Eleventh Amendment immunity. Similar to the sheriff defendants in *Kennedy*, Court Security relies on Maryland statutory law insofar as they allege that they are state officials for purposes of federal law. Court Security offers no other conclusive evidence of their status as state officers and simply repeat the state law governing the immunity of state officers from suit.

**III.    EVEN ASSUMING *ARGUENDO* THAT A CLAIM OF ELEVENTH AMENDMENT IMMUNITY UNDER THE UNITED STATES CONSTITUTION COULD OTHERWISE BE ASSSERTED, IT WOULD BEEN WAIVED BY THE DEFENDANTS' REMOVAL OF THIS ACTION FROM STATE TO FEDERAL COURT.**

The Eleventh Amendment of the United States Constitution grants a state immunity from suit in federal court by citizens of other States, and by its own citizens.[79] However, not unlike the facts before the Supreme Court of the United States in *Lipides v. Board of Regents of the University System of Georgia*, the State of Maryland and  the individual Defendants removed this lawsuit from state court to federal court of their own volition.[80]

The Supreme Court has established the general principal that a state's voluntary appearance in federal court amounts to a waiver of its Eleventh Amendment immunity and has often cited with approval the cases embodying that principle.[81] Here, the State of Maryland, the Mayor & City Council of Baltimore City, and the individual Defendants were brought involuntarily into this lawsuit as a Defendants in the Circuit Court for Baltimore City, but the State of Maryland and the individual Defendants voluntarily removed the case to federal court, thus voluntarily invoking this Court's

---

[78]    *See Allegany County Government Department of Public Safety, Homeland Security & Bureau of Police,* http://gov.allconet.org/DPSHS/index.htm (last visited Oct. 7, 2008); *See Office of the Sheriff Allegany County, Mission Statement,* http://www.acso.allconet.org/ (last visited Oct. 7, 2008).

[79]    U.S. Const., Amdt. 11; *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

[80]    535 U.S. 613 (2002).

[81]    *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780; *Gardner v. New Jersey*, 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504; *Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477; *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 681, n. 3, 119 S.Ct. 2219, 144 L.Ed.2d 605.

jurisdiction.[82] "And unless we are to abandon the general principal just stated...waiver ought to apply."[83]

**IV.     THE PLAINTIFF HAS SUFFICIENTLY ALLEGED FACTS TO SUPPORT A CLAIM FOR RESPONDEAT SUPERIOR LIABILITY BECAUSE THE COMPLAINT ALLEGES THAT SUPERVISORS FAILED TO INSURE THAT THEIR SUBORDINATES REFRAINED FROM A POLICY OF DISCRIMINATING AGAINST DISABLED VISITORS AND/OR DENYING DISABLED VISITORS ACCESS TO THE COURTS.**

Supervisors are under an obligation to "insure that [their] subordinates act within the law."[84]Although they may not be able to prevent all instances of illegal acts by their subordinates, if supervisors are "on notice of a subordinate's tendency to act outside the law" and fail to take steps to prevent such behavior, they "bear some culpability for [the] illegal conduct [of] their subordinates."[85] If a plaintiff demonstrates that: (1) the supervisor had actual or constructive knowledge that the actions of his subordinate posed a risk of constitutional violation (2) the supervisors inadequate response demonstrated a "deliberate indifference or tacit authorization of the alleged" conduct; and (3) "there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff," then he has established the supervisor's liability under the theory of *respondeat superior.*[86] " Supervisory officials may be held liable for the constitutional violations of their employees if their indifference or tacit authorization of subordinate's misconduct caused an injury."[87] The Fourth Circuit, has also recognized that "supervisory liability can extend to the highest levels of state government."[88] A showing of "continued inaction in the face of documented widespread abuses" is sufficient to demonstrate a supervisor's indifference.[89]

In *Shaw v. Stroud,* a trooper shot a suspected drunk driver dead and his widow instituted an action against the trooper and his supervisors.[90] On appeal from a district courts denial of a summary judgment on the issue of supervisory liability, the Fourth Circuit found that knowledge of at least three prior incidents of constitutional violations sufficiently demonstrated that the supervisor possessed actual

---

[82]  *Lipides,* 535 U.S. at 614.

[83]  *Lipides,* 535 U.S. at 619.

[84]  *Randall v. Prince George's County,* 302 F.3d 188, 203 (4th Cir. 2002).

[85]  *Id.* at 203.

[86]  *Id.* at 206.

[87]  *Ensko v. Howard County,* 423 F. Supp. 2d 502 (D. Md. 2006).

[88]  *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994).

[89]  *Id.* at 799.

[90]  *Shaw v. Stroud,* 13 F.3d 791 (4th Cir. 1994)

or constructive knowledge that his subordinate's actions posed a risk of constitutional injury.[91]

Here, the Amended Complaint successfully alleges facts to satisfy the requirements under supervisory liability. The Amended Complaint alleges that "…the [supervisors] received complaints about the conduct of Court Security, including those named in the Amended Complaint… and [that Court Security] exhibited conduct or disciplinary problems that posed a pervasive and unreasonable risk of harm to disabled visitors like Ms. Carter."[92] "That the [superiors] knew or in the exercise of due diligence would have known that the conduct displayed by Court Security was likely to occur."[93] And that the supervisors "failed to take any preventative or remedial measures to guard against the conduct of Court Security."[94]

All that is required of a pleading is a "short and plain" statement on which relief can be granted.[95] The United States Supreme Court has held that "a federal court may [not] apply a 'heightened pleading standard'-more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure-in civil rights cases alleging municipal liability."[96] Thus, the Amended Complaint properly sets forth statements upon which relief can be granted under the theory of *respondeat superior* and/or supervisory liability.

**V. THE DEFENDANTS ARE NOT ENTITLED TO PUBLIC OFFICIAL IMMUNITY FROM THE PLAINTIFFS' STATE LAW CLAIMS BECAUSE THE DEFENDANTS ACTED WITH MALICE AND PUBLIC OFFICIAL IMMUNITY DOES NOT APPLY TO INTENTIONAL TORT CLAIMS OR VIOLATIONS OF THE MARYLAND DECLARATION OF RIGHTS.**

A.   THE PLAINTIFF HAS ALLEGED FACTS, UNDER THE MARYLAND DECLARATION OF RIGHTS AND THE MARYLAND COMMON-LAW INTENTIONAL TORT CLAIMS, WHICH ARE SUFFICIENT TO STATE CLAIMS FOR WHICH RELIEF MAY BE GRANTED AND DEFEAT PUBLIC OFFICIAL IMMUNITY.

Public official immunity is a Maryland common law and statutory defense to state law claims.[97] For public official immunity to apply:

---

[91]   *Shaw*, 13 F.3d at 800.

[92]   Amended Complaint at ¶ 61.

[93]   *Id.* at ¶ 62.

[94]   *Id.* at ¶ 63.

[95]   Fed. R. Civ. P. 8(a) (1).

[96]   *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993).

[97]   *Livesay v. Balt. County*, 862 A.2d 33, 39 (Md. 2004).

> (1) The actor must be a public official, rather than a mere government employee or agent; (2) the conduct must have occurred while the actor was performing discretionary, as opposed to ministerial, acts; and (3) the actor must have performed the relevant acts within the scope of his official duties. If those three conditions are met, the public official enjoys a qualified immunity in the absence of "malice."[98]

Here, Ms. Carter has alleged facts to demonstrate that the Defendants committed the intentional torts of assault and battery. Specifically, during the course of Ms. Carter's two attempts to clear security screening at the Circuit Court for Baltimore City, the Defendants intentionally threatened her, possessing the apparent present ability to carry out their threats, and raising in Ms. Carter's mind the apprehension of imminent bodily harm.[99]   Additionally, they committed intentional and unpermitted touchings of Ms. Carter's body with actual malice, that were harmful and offensive to Ms. Carter, including offending her reasonable sense of dignity, and causing her physical pain, injury, and illness.[100]

In addition, Ms. Carter has alleged facts to show that the Defendants violated her rights arising under Articles 19 and 24 of the Maryland Declaration of Rights.[101]   Specifically, the Defendants deprived Ms. Carter of her rights to access the courts, which *inter alia* require that visitors to the Circuit Court of Baltimore City have access that is free from unreasonable restrictions, i.e. disability discrimination that inhibits participation.

As a matter of law, the violations of the Maryland Declaration of Rights and the intentional tort claims are not barred by public official immunity.[102]  Therefore, the facts the Plaintiff haa alleged, if credited as true as they should be on Defendants' Motions to Dismiss, are sufficient to state claims upon which relief can be granted, and this Court should deny the Defendants' Motion to Dismiss.

---

[98]   *Briddell v. Chester,* 206 F. Supp. 2d 733, 740 (4th Cir. 2002) (citing *Bait. Police Dep't v. Cherkes,* 780 A.2d 410, 437 (Md. Ct. Spec. App. 2001)). However, public official immunity does not apply to violations of the Maryland Constitution. *Okwa v. Harper,* 757 A.2d 118, 140 (Md. 2000) ("A state public official alleged to have violated Article 24, or any article of the Maryland Declaration of Rights, is not entitled to qualified immunity."). In addition, public official immunity does not apply to suits based on intentional torts. *Lee v. Cline,* 863 A.2d 297, 305 (Md. 2004) ("The Maryland public official immunity doctrine is quite limited and is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct.").

[99]   Amended Complaint at ¶ 122.

[100]   *Id.* at ¶ 123.

[101]   *Id.* at ¶¶ 88-96.

[102]   *Okwa*, 757 A.2d at 140 (stating that public official immunity is not available for a violation of the Maryland Declaration of Rights); *Lee*, 863 A.2d at 305 (stating that public official immunity is not applicable to intentional torts).

B.    THE PLAINTIFF HAS ALLEGED FACTS, UNDER MARYLAND COMMON-LAW NEGLIGENCE
CAUSES OF ACTION, WHICH ARE SUFFICIENT TO STATE A CLAIM FOR WHICH RELIEF MAY BE
GRANTED AND DEFEAT PUBLIC OFFICIAL IMMUNITY.

Ms. Carter has alleged facts, which, if credited as true, demonstrate that the Defendants were
negligent in carrying out their duties. As noted above, a showing of malice defeats public official
immunity.[103] The Court in *Briddell* defined such malice as "an act... with an evil or rancorous motive
influenced by hate, the purpose being to deliberately and willfully injure the plaintiff."[104]  While mere
insensitivity or suspicion is insufficient to establish the presence of malice, facts demonstrating animus
of a protected class can provide support for a claim of malice.[105]

Here, the Defendants were negligent in permitting or carrying out a policy, pattern, practice,
and custom of discriminatory security screening. As communicated above, the superiors knew their
subordinates were engaging in such practices against disabled visitors, which demonstrates the animus
necessary to show malice. The fact that the Defendants engaged in this behavior, in breach of their duty
to uphold the law in a manner that did not discriminate against disabled visitors, and as a policy,
pattern, practice, and custom against disabled visitors, shows the animus necessary to support a finding
of malice. Thus, Ms. Carter has alleged facts, which, if taken as true, are sufficient to state claims of
common-law negligence upon which relief may be granted and show the malice required to defeat the
Defendants' claims to public official immunity. Thus, the Court should deny their Motions to Dismiss.

VI.    **THE DEFENDANTS ARE NOT ENTITLED TO STATE PERSONNEL IMMUNITY
FROM THE PLAINTIFF'S STATE LAW CLAIMS BECAUSE THEY ACTED WITH
MALICE AND GROSS NEGLIGENCE.**

State personnel are immune from liability in tort only for acts or omissions, which are (1) within
the scope of the public duties of the State personnel, and (2) made without malice or gross negligence.[106]

For the purpose of state personnel immunity, "malice " is defined as "conduct characterized by
evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud."[107]
"Malice" can exist even when "conduct is objectively reasonable."[108] The previously recognized
"subjective" aspect of qualified or "good faith" immunity-whereby such immunity is not available if the

---

[103]    *Briddell*, 206 F. Supp. 2d at 740.

[104]    *Id.* (citing *Williams v. Mayor of Bait.*, 753 A.2d 41, 57 n. 16 (Md. 2000) (citation and quotation omitted)).

[105]    *Id.*

[106]    Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) (2008).

[107]    *Lee,* 863 A.2d at 311 (citing *Shoemaker v. Smith*, 725 A.2d 549, 559 (Md. 1999)).

[108]    *Id.* at 311 (citing *Shoemaker*, 725 A.2d at 560).

official asserting the defense "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury" - frequently has proved incompatible with the principle that insubstantial claims should not proceed to trial.[109] Henceforth, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known.[110]

The Maryland Court of Appeals has defined "negligence" as "any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm."[111]  However, the court has held that, in order to defeat state personnel immunity, "something more than simple negligence" is necessary; thus, "gross negligence" is defined as

> An intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.[112]

Whether the Defendants were working in the scope of their public duties is not in dispute; however, the Plaintiff has alleged facts to demonstrate that the Defendants acted with malice and gross negligence.

A.    THE PLAINTIFF HAS ALLEGED FACTS, UNDER THE MARYLAND DECLARATION OF RIGHTS AND MARYLAND COMMON-LAW TORT CLAIMS, WHICH ARE SUFFICIENT TO STATE A CLAIM AND DEFEAT STATE PERSONNEL IMMUNITY.

Ms. Carter has alleged facts, which, if credited as true as they should be on a motion to dismiss, demonstrate that the Defendants maliciously violated her rights under Articles 19 and 24 of the Maryland Declaration of Rights.[113] The Defendants displayed a knowing and deliberate wrongdoing by subjecting her to electromagnetic fields when they knew that it would severely injure her. The Defendants demonstrated an evil and wrongful motive by subjecting Ms. Carter to a electromagnetic

---

[109] *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000  (1975).

[110] *Id.*

[111] *Barbre v. Pope,* 935 A.2d 699, 717 (Md. 2007).

[112] *Id.*

[113] Amended Complaint at ¶ ¶ 88-96.

fields when she had already been injured by Court Security on a previous occasion. Further, the Defendants exhibited ill will by refusing to provide Ms. Carter with any medical assistance or even attempting to locate someone that could. Thereby, Ms. Carter's rights were denied under Articles 19 and 24 of the Maryland Declaration of Rights. These facts, and the reasonable inferences therefrom, if taken as true, are sufficient to state a claim upon which relief may be granted and defeat the Defendants' state personnel immunity to Ms. Carter's claims under the Maryland Declaration of Rights. Thus, this Court should deny the Defendants' Motions to Dismiss.

Secondly, the Plaintiff has alleged facts, which, if credited as true as they should be on a motion to dismiss, demonstrate that the Defendants committed, with malice, the intentional torts of assault and battery as described *supra*. In the context of disability discrimination and retaliation, the Defendants committed these two common law torts with ill will and knowing and deliberate wrongdoing. These facts, and the reasonable inferences therefrom, if taken as true, are sufficient to state a claim upon which relief may be granted and defeat the Defendants' state personnel immunity to the Plaintiff's intentional tort claims under Maryland common law. Thus, this Court should deny the Defendants' Motions to Dismiss.

Finally, Ms. Carter has alleged facts, which, if credited as true as they should be on a motion to dismiss, demonstrate that the Defendants were grossly negligent in their interaction with her, exhibiting something more than simple negligence in carrying out their duties. The Defendants, by subjecting Ms. Carter to electromagnetic rays after being informed what would likely happen, exhibited a reckless disregard of the consequences affecting Ms. Carter's person and property. Through a policy, pattern, practice, and custom of subjecting disabled visitors to disability discrimination, the Defendants demonstrated an intentional failure to perform their affirmative duty to uphold the law in a manner that does not discriminate against the disabled. The Defendants participation, or lack thereof, in assisting Ms. Carter on either occasion once she collapsed, indicates their utter indifference to her rights, treating them as if they did not exist. These facts, and the reasonable inferences therefrom, if taken as true, are sufficient to state a claim upon which relief may be granted and defeat the Defendants' state personnel immunity to Ms. Carter's negligence claim under Maryland common-law. Thus, this Court should deny the Defendants' Motions to Dismiss.

B.   THE PLAINTIFF HAS ALLEGED FACTS, UNDER THE MARYLAND COMMON-LAW CLAIM OF SUPERVISORY NEGLIGENCE, WHICH ARE SUFFICIENT TO STATE A CLAIM AND DEFEAT STATE PERSONNEL IMMUNITY.

Plaintiffs have alleged facts, which, if credited as true as they should on a motion to dismiss, indicate the Defendants were grossly negligent in their supervisory roles as communicated *supra*, exhibiting something more than simple negligence in carrying out their duties. The Defendants'

supervision of an isolated incident of disability discrimination might indicate simple negligence. However, the supervisory Defendants failed to prevent a policy, pattern, and practice of disability discrimination. Such failure represents more than simple negligence; instead, it demonstrates an intentional failure to perform their affirmative duty of guiding, disciplining, and training their subordinates according to non-discriminatory policies and practices. By failing to uphold the law in a discrimination free environment, the supervisory Defendants exhibited an utter indifference to Ms. Carter's rights to be free from disability discrimination at security checkpoints, as if Ms. Carter's rights arising under the Fourteenth Amendment to the United States Constitution, the ADA and the Rehab. Act, the Maryland Declaration of Rights Articles 19 and 24, and Maryland common-law did not exist. These facts, and the reasonable inferences therefrom, if taken as true, are sufficient to state a claim upon which relief may be granted and defeat the Defendants state personnel immunity to Ms. Carter's supervisory negligence claims under Maryland common law. Thus, this Court should deny the Defendants' Motions to Dismiss.

## VI.    THE DEFENDANTS ARE NOT ENTITLED TO JUDICIAL IMMUNITY.

A.    ABSOLUTE JUDICIAL IMMUNITY UNDER COMMON LAW

The principle that judges are absolutely immune from civil liability for the exercise of their judicial duties "has been part of the common law since very early days"[114] This common law principle has "neither been abrogated nor been modified in Maryland"; instead, it has been affirmed in a number of decisions of the Court of Appeals.[115]

In developing the principle of absolute judicial immunity, the Maryland courts have distinguished the qualified - and narrower -immunity generally accorded to public officials for discretionary acts. The defense of qualified immunity provides "'ample protection to all but the plainly incompetent or those who knowingly violate the law.'"[116] Because qualified rather than absolute immunity is "ordinarily ... sufficient to protect government officials in the exercise of their duties," an official who seeks absolute immunity "bears the burden of showing that such immunity is 'justified for the function in question.'"[117]

---

[114]    *Parker v. State*, 337 Md. 271, 277, 653 A.2d 436 (1995) (holding that a judge who issued an arrest warrant was absolutely immune from suit).

[115]    *Mandel v. O'Hara*, 320 Md. 103, 107, 576 A.2d 766 (1990).

[116]    *Simms v. Constantine*, 113 Md. App. 291, 313, 688 A.2d 1 (1997) (quoting *Burns v. Reed*, 500 U.S. 478, 494-95 (1991)).

[117]    *Gill v. Ripley*, 352 Md. 754, 768, 724 A.2d 88 (1999) (quoting *Burns*, 500 U.S. at 486).

Absolute judicial immunity, unlike qualified immunity, applies regardless of the nature of the tort and even where a plaintiff alleges that a judge acted in bad faith, maliciously or corruptly.[118] Absolute immunity is a broad immunity from suit, not just from the ultimate assessment of damages.[119] By comparison, qualified immunity shields a public official from liability for non-malicious negligent conduct committed in the performance of discretionary acts in furtherance of official duties.[120]

1.      *Application of Common Law Immunity to Other Court Officers*

Although the absolute immunity doctrine was first applied to judges, it "eventually was expanded to include others involved with the judicial process."[121]  In defining the scope of absolute judicial immunity, the Court of Appeals has adopted a "functional approach," holding that absolute immunity should be accorded "so long as their acts are 'judicial' ... in nature and within the very general scope of their jurisdiction."[122] A limited but absolute privilege has also been recognized for witnesses, parties to litigation and attorneys, with respect to communications with the client, the examination of witnesses, and statements made to the court or jury and in pleadings.[123] Officials other than judges involved in the judicial process are protected by absolute immunity "because their judgments are functionally comparable to that of judges - that is, because they, too, exercise a discretionary judgment as part of their function."[124] Thus, the general rule is that individuals employed by a court, acting under the direction of a judge, or implementing a judicial order, "when performing tasks that are integral to the judicial process, enjoy the same immunity that is applicable to the judges."[125]

No reported Maryland case specifically addresses whether Court Security is to be accorded judicial immunity. However, based on the judicial interpretations communicated herein and because Court Security was not carrying out a judicial function, i.e. serving a warrant, it is clear that they do not qualify for judicial immunity.

---

[118]    *See Parker*, 337 Md. at 284-85.

[119]    *See* J. Knoll, *Protecting Participants in the Mediation Process: The Role of Privilege and Immunity*, 34 Torts & Ins.L.J. 115, 122 (1998).

[120]    *See Smith v. Danielczyk*, 400 Md. 98, 129, 928 A.2d 795 (2007).

[121]    *Gill*, 352 Md. at 761 (holding that prosecutors and their support staff were absolutely immune for dismissing a paternity action without the mother's consent).

[122]    *Id*. at 770.

[123]    *Id*. at 762.

[124]    *Id*. at 762.

[125]    *Id*. at 771; cf. *Fox v. Wills*, 390 Md. 620, 890 A.2d 726 (2006) (holding that an attorney appointed as guardian ad litem is not entitled to absolute immunity because the attorney functions primarily as an advocate for the child rather than as an agent of the court).

B.   ABSOLUTE JUDICIAL IMMUNITY UNDER FEDERAL LAW

With respect to federal claims, qualified immunity also protects public officials in § 1983 actions. In § 1983 actions, public officials are immune except for acts that violate the settled constitutional rights of the plaintiff at the time the act occurred.[126] Under an objective standard that assesses the reasonableness of the public official's actions, "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery."[127]

In *Wagshal v. Foster*, the United States Court of Appeals for the District of Columbia held that a court-appointed mediator had absolute immunity.[128] It distilled the Supreme Court's approach to quasi-judicial immunity to a consideration of three main factors:

> (1) whether the functions of the official in question are comparable to those of a judge;
>
> (2) whether the nature of the controversy is intense enough that future harassment or intimidation by litigants is a realistic prospect; and
>
> (3) whether the system contains safeguards which are adequate to justify dispensing with private damage suits to control unconstitutional conduct.[129]

The D.C. Circuit found that a mediator's activities met these criteria. First, the court determined that the mediator's activities are "integrally related to adjudication proper."[130] Second, the court noted that the "[c]onduct of pre-trial case evaluation and mediation also seems likely to inspire efforts by disappointed litigants to recoup their losses, or at any rate harass the mediator, in a second forum."[131] Finally, the court found that the litigant could complain to the judge who appointed the mediator or seek recusal of the mediator and thereby obtain relief from any purported misconduct.[132] Here, we have no such connection. Court Security's functions are in no way comparable to those of a judge nor are either of the remaining two factor.

---

[126]   *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[127]   *Id*. at 817-18.

[128]   28 F.3d 1249 (D.C. Cir. 1994).

[129]   *Wagshal*, 28 F.3d at 1252 (citing *Butz v. Economou*, 438 U.S. 478, 512 (1978)).

[130]   28 F.3d at 1253.

[131]   *Id*.

[132]   *Id*.

## VII.   THE COMPLAINT SUFFICIENTLY STATES A MONELL POLICY, PATTERN, PRACTICE, AND/OR CUSTOM CLAIM.

> *Decency, security and liberty alike demand that government officials shall be subjected to the rules of conduct that are commands to the citizen. If government becomes a lawbreaker, it breeds contempt for the law, it invites every man to come a law unto himself.*[133]
>
> **-** Justice Louis Brandeis

The Amended Complaint alleges unconstitutional policies, patterns, practices, and/or customs.[134] It further alleges that those policies, patterns, practices and/or customs amounted to a deliberate indifference and were the moving force behind the denial of Ms. Carter's rights to access to the courts.[135] The Complaint additionally identifies certain policies, patterns, practices, and/or customs at issue, which include Court Security's refusal to appropriately accommodate Ms. Carter and their corresponding denial of Ms. Carter's access to the courts in violation of the Fourteenth Amendment to the United States Constitution.[136]

For Ms. Carter's policy, pattern, practice, and/or custom claim under *Monell v. Dept. of Soc. Servs.*, the Amended Complaint satisfies the Rule 8 notice pleading requirement enunciated in *Swierkiewicz v. Soreman* and *Chao v. Wood, Inc.*[137]  The Amended Complaint "inform[s] the opposing party of the claim and its general basis" and is "detailed and informative enough to enable the defendant to respond." Moreover, the Defendants have not proven beyond doubt that Ms. Carter will be unable to prove her *Monell* claims against the Defendants.

### CONCLUSION

For all the foregoing reasons, this Honorable Court should deny the Defendants' respective Rule 12(b) (6) Motions to Dismiss and permit the case to proceed to discovery. The Defendants have presented no meritorious reason why *The Wanded Woman* is not entitled to redress.

We must not be deterred by the difficulty of the issue. For what is at stake is the very integrity of our system of justice. As Judge Jack B. Weinstein noted:

---

[133]  *United States v. Olmstead*, 277 U.S. 438 (1928).

[134]  Amended Complaint at ¶¶ 41-56.

[135]  *Id.*

[136]  *Id.*

[137]  436 U.S. 658, 98 S.Ct. 2018 (1978); 534 U.S. 506, 512, 122 S.Ct. 192 (2002); 415 F.3d 342, 347-9 (4th Cir. 2005).

Accessibility to the courts on equal terms is essential to equality before the law. If we cannot provide this foundational protection through the courts, most of the rest of our promises of liberty and justice for all remain a mockery for the poor and the oppressed.

We should act urgently and with dispatch, as if our legal system depends on it. It does.

August 17, 2012                                    Respectfully submitted,

                                           _____/s/_____
                                           Barry R. Glazer, Esquire
                                           The Law Office of Barry R. Glazer, P.C.
                                           1010 Light Street
                                           Baltimore, Maryland 21230
                                           Phone:  (410) 547-8568
                                           Fax:     (410) 547-0036
                                           Bar Roll No.: 08371