In the

# United States District Court
# for the District of Maryland

## Case No.: 1:12-cv-01789

### Linda Carter

*Plaintiff*

vs.

### State of Maryland, *et al.*

*Defendants*

## Opposition to the Defendants'
## Motion for Summary Judgment

***Charles H. Edwards IV***
Law Office of Barry R. Glazer, P.C.
1010 Light Street
Baltimore, Maryland 21230
phone: (410) 547-8568
fax: (410) 547-0036
bar number: 29977
*charles.edwards@robinhoodlawyers.com*
*Attorney for Plaintiff*

INTENTIONALLY BLANK

Plaintiff Linda Carter, by and through her attorneys, Charles H. Edwards IV and The Law Office of Barry R. Glazer, P.C., submits this Opposition to the Defendants' Motion for Summary Judgment, for the reasons set forth below and more fully in the accompanying supporting Memorandum of Law, the Defendants' Motion for Summary Judgment must be denied in its entirety:

1. Material issues of fact exist as to the circumstances of the occurrences underlying this litigation, precluding summary judgment as a matter of law;

2. Ms. Carter's Counter-Statement of Facts and the depositions of both Ms. Carter and the named Defendants, separately and together, indisputably demonstrate that there are, at a minimum, genuine issues of material fact concerning the Defendants' liability.

3. The Defendants have not met their burden of proof on their Motion for Summary Judgment. Instead, they have peppered their Motion for Summary Judgment with the same arguments that were harshly disposed of in Honorable James K. Brendar's pervious adjudication of their Motion to Dismiss.

4. The vast majority of Ms. Carter's claims are typically decided by juries, not judges, and the Defendants have manifestly failed to identify any reason why this case should be an exception to this rule.

5. A motion for summary judgment must be evaluated with all inferences construed in favor of the non-moving party; for reasons set forth fully in the accompanying Memorandum of Law, such inferences, when properly drawn in light of the disputed and undisputed facts, preclude summary judgment as a matter of law.

**WHEREFORE**, the Plaintiff, Linda Carter, respectfully requests that the Defendants' Motion for Summary Judgment hereby be denied in its entirety.

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, P.C.**

*Charles H. Edwards IV*

_____
Charles H. Edwards IV
Law Offices of Barry R. Glazer
P.O. Box 27166
1010 Light Street
Baltimore, Maryland 21230
(410) 547-8568
Bar Roll No.: 29977
*Attorney for the Plaintiff*

In the

# United States District Court

# for the District of Maryland

**Case No.: 1:12-cv-01789**

**Linda Carter**

*Plaintiff*

vs.

**State of Maryland, *et al.***

*Defendants*

## Memorandum in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment

***Charles H. Edwards IV***
Law Office of Barry R. Glazer, P.C.
1010 Light Street
Baltimore, Maryland 21230
phone: (410) 547-8568
fax: (410) 547-0036
bar number: 29977
*charles.edwards@robinhoodlawyers.com*
*Attorney for Plaintiff*

INTENTIONALLY BLANK

The plight of people with disabilities reflected nothing less than a regime of state mandated segregation...that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow.

**- Honorable Thurgood Marshall**
*City of Cleburne v. Cleburne Living Center* (1985)

Earlier today, crowds gathered at the Edmond Pettus Bridge in Selma, Alabama, to remember and reflect upon the sacrifices of the freedom-marchers who were clubbed and tear-gassed by state troopers as they peacefully demonstrated on March 7, 1965, a half century ago, on a day that came to be known as "Bloody Sunday." Like Judge Marshall, the Plaintiff, Linda Carter, references the struggle for rights for the disabled in the same context as the civil rights movement for people of all colors because it was only from the top of the mountaintop they climbed that we as a people were able to see that 'all men are created equal.'

In fact, prior to the enactment of the Rehabilitation Act in 1978, few in the American public would have seen the failure to provide alternative screening methods to courthouse visitors with implanted neurostimulators as a civil rights violation because our legal system had not yet extended the logic of Martin Luther King, Rosa Parks, and the 1964 Civil Rights Act -- that "separate but equal" was anything but equal -- to those who had implanted medical devices, sat in wheelchairs, had trouble hearing, or could not see. The paradigm shift toward the legal protections for people with disabilities as were recognized for "colored" people owes itself in no small part to a handful of unreasonable individuals who failed to accept pity in response to disability -- and who have argued instead that "benign neglect" is still neglect and ignoring an issue will not make it go away. To that end, Ms. Carter and her counsel make no apology for bringing this lawsuit challenging the Baltimore City Sheriff's Office and its treatment of visitors with disabilities wishing to enter the Circuit Court of Maryland for Baltimore City (*hereinafter,* the "Circuit Court").

Currently, before the Court, is the State Defendants' Motion for Summary Judgment, wherein they have accused Ms. Carter and her counsel of "employ[ing] rather aggressive over-the-top rhetoric in describing the State Defendants' actions as 'outrageous' and 'egregious' violations of her civil rights." Additionally, the State Defendants' Motion for Summary Judgment expressly states the "Defendants are hopeful that the Court has found [Ms. Carter's characterization of her claims] inappropriate and unhelpful." Ms. Carter is fighting for the State of Maryland to recognize her civil right to be free from disability discrimination and her corresponding well-settled constitutional right to access the courts. The named State Defendants are black. It is doubtful that they would characterize the denial of their civil rights based on their race as anything short of "outrageous" or "egregious." Or is that the message the

State of Maryland is trying to send - literally that visitors with disabilities to the Circuit Court are "separate but equal."

Ms. Carter filed this case in the Circuit Court after she was severely injured by the State Defendants and their metal detectors during security screenings following her presentation at security checkpoints to attend court proceedings relating to her divorce action. Ms. Carter sued the State of Maryland, the Mayor & City Council of Baltimore City; Beverly Carter, Court Administrator for the Circuit Court for Baltimore City; John Anderson, Sheriff of Baltimore City; Donald Rheubottom, a Captain in the Sheriff's Office of Baltimore City; John and Jane Does 1-20, Deputy Sheriffs and/or Court House Security Officers; and Richard and Jane Roes 1-20, supervisors of John and Jane Does 1-20. All the Defendants joined in removing the case to federal court.

Following the removal of the case to federal court, the Mayor & City Council of Baltimore City filed a motion to dismiss for failure to state a claim and a similar motion was, thereafter, collectively filed by the State Defendants. These two motions addressed Ms. Carter's Amended Complaint.[1] On December 3, 2012, the Honorable James K. Brendar granted the Mayor & City Council's Motion to Dismiss and granted in part and denied in part the State Defendants' Motion to Dismiss.

The remaining claims against the State Defendants are as follows:

**Count 3** – Violation of Title II of the ADA (all Defendants in their Official Capacities only);

**Count 4** – Violation of Section 504 of the Rehabilitation Act (all Defendants in their Official Capacities only);

**Count 5** – Violation of Due Process under 42 U.S.C. § 1983 (Access to the Courts) (Deputies Price, Beverly and Monroe in their Individual Capacities only);

**Count 6** – Violation of the Maryland Declaration of Rights (Deputy Monroe only);

**Count 10** – Negligence (Failure to Provide Medical Care) (Deputy Monroe only); and

**Count 11** – Assault and Battery (viable only insofar as it alleges an attempted battery and not the intent-to-frighten type of assault) (Deputy Monroe only).

**Count 12** – *Respondeat Superior* (State of Maryland)

In addition to adjudicating the merits of the State Defendants' Motion to Dismiss, Judge Brendar went to great pains to educate the State Defendants about disability law and the constitutional right to access the courts. Also, in disposing of the State Defendants' arguments, Judge Brendar made statements that should have alerted the State Defendants as to the absurdity of their arguments, including

---

[1] In October 2014, Ms. Carter's unopposed Motion for Leave to file a Second Amended Complaint was granted, which simply inserted Defendant Deputies Price, Beverly, and Monroe into the places of John Does 1, 2, and 3, respectively.

"[a]stoundingly, the Defendants argue that…" and the "Defendants make an equally implausible, and even more bizarre argument…" However, the State Defendants have not only ignored Judge Brendar's harsh words, but, even worse, have reasserted the same grounds for dismissing Ms. Carter's claims in their recently filed Motion for Summary Judgment. The material facts of this case have not changed and nor should this Court's evaluation of the merits of the State Defendants' arguments.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

### PLAINTIFF'S COUNTER-STATEMENT OF DISPUTED MATERIAL FACTS

As communicated above, there has been no change in the material facts of this case. The grounds and authorities relied on by Judge Brendar in his drafting of his December 3, 2012, Memorandum of Law (*hereinafter,* the "Judge's Memorandum"), which adjudicated the Defendants' Motion to Dismiss are just as relevant today as they were two years ago. With the Defendants' Motion to Dismiss having been adjudicated on the same material facts as the Defendants' pending Motion for Summary Judgment, Ms. Carter has reproduced the grounds relied on by Judge Brendar directly below and footnoted additional supporting evidence. Additionally, the Defendants have misrepresented numerous material facts and asserted numerous sweeping conclusions that are both illogical and unsupported by expert testimony. Ms. Carter has gone to great pains to correct the Defendants' illogical and unsupported assertions in a chart, which directly follows the reproduction of the grounds relied on in the Judge's Memorandum, which provides, in pertinent part, as follows:

[Ms.] Carter had a neuro-transmitter device surgically implanted a few years ago in the mid-thoracic region of her spine to manage pain caused by her disability.[2] She must avoid exposure to electromagnetic fields at security checkpoints by requesting disability accommodations in the form of alternative security screening.[3] She has been issued a disability identification card requiring alternate security screening to protect her from exposure to electromagnetic fields produced by metal detectors, metal detecting wands, or similar devices.[4] Twice, she entered the Baltimore City Circuit Courthouse to attend court proceedings in her divorce action and was subjected to electronic metal detectors, which caused her to be electrically shocked.[5]

The first occasion was on November 17, 2011, when [Ms.] Carter entered the courthouse for a scheduling conference.[6] She presented her medical identification card to a court security officer, John Doe 1, and explained that she is disabled and needs alternate security screening because of her implanted medical device.[7] John Doe 1 "insisted that Ms. Carter squeeze around the metal detector," which exposed her to electromagnetic fields and caused her to experience extreme pain in her back.[8] She collapsed from pain, but was provided no assistance such as emergency medical services.[9]

---

[2] *See* Linda Carter's Deposition taken on July 15, 2014, at pgs. 31-4; 6-7, 6-21, 1, 5-6, attached hereto as Exhibit A; *see also* Linda Carter's Answers to the State of Maryland's Interrogatories at pg. 29, No. 1, attached hereto as Exhibit B.

[3] Exhibit A at pgs. 37, 49-50; 9-21, 11-21, 1-10; Exhibit B at pg. 29, No. 1.

[4] *Id.*

[5] Exhibit A at pgs. 51, 66, 68, 95, 96; 6-14, 16-7, 12-4, 7-21, 5-8; Exhibit B at pg. 29, No. 1.

[6] Exhibit A at pg. 51; 6-14; Exhibit B at pg. 29, No. 1.

[7] Exhibit A at pgs. 53-5, 59, 66; 6-15, 19-21, 1-7, 14-21, 2-20; Exhibit B at pg. 29, No. 1.

[8] *Id.*

[9] *Id.*

The second occasion was on March 28, 2012, when [Ms.] Carter came to the courthouse to attend a hearing.[10] Again, she presented her medical identification card to another court security officer, John Doe 2, and explained that her disability requires alternate security screening because of her implanted medical device that cannot be subjected to electromagnetic fields emitted by metal detectors or metal detecting wands.[11] [Ms.] Carter also informed John Doe 2 of her experience on November 17, 2011.[12] John Doe 2 assured [Ms.] Carter she would be patted down and not subjected to any security screening involving a metal detector or metal detecting wand. [Ms.] Carter proceeded to the adjacent screening area where she was introduced to John Doe 3, to whom she began explaining all that she had just communicated to John Doe 2.[13] John Doe 2 joined Carter in her explanation and explained to John Doe 3 that he had already seen her medical identification card and that she was to receive a disability accommodation in the form of a policy modification, *i.e.*, a security pat-down with no metal detector or metal detecting wand.[14] John Doe 3 agreed. Carter then, as instructed by John Doe 3, lifted her arms for a security pat-down.[15]

> However, suddenly and without warning, John Doe 3 grabbed a metal detecting wand and stated that "it is policy." With that, he ran the metal detecting wand down Ms. Carter's back. And again, Ms. Carter was electronically shocked and collapsed. This time, however, the shocking didn't stop. As she discovered when she was finally able to stand, with each step she took, she experienced an extreme and debilitating electronic shock. Through all Ms. Carter's pain and suffering in and around Court Security, they kept screening more visitors and never offered her any assistance, including contacting emergency medical services.[16]

[Ms.] Carter, with great difficulty, proceeded to the courtroom where the presiding judge called an ambulance for her and advised her to get a lawyer.[17]

---

[10] Exhibit A at pgs. 83-4; 20-1, 1-2; Exhibit B at pg. 29, No. 1.

[11] Exhibit A at pgs. 90-1; 1-8, 2-12; Exhibit B at pg. 29, No. 1.

[12] *Id.*

[13] *Id.*

[14] *Id.*; *see also* Exhibit A at pgs. 92-6; 20-1, 1-17, 19-21, 1-21, 4-19.

[15] *Id.*

[16] *Id.*; *see also* Exhibit A at pgs. 100-1; 5-21, 1-9.

[17] *Id.*

| DEFENDANTS' STATEMENT | PLAINTIFF'S DISPUTES |
|---|---|
| *In the second incident, [the Plaintiff] alleges an injury from the attempted use of a handheld magnetometer, or metal detecting wand.* | In the second incident, the serious injuries that Ms. Carter sustained were not from the attempted use of a handheld metal detecting wand, but rather by the *intentional* use of a metal detecting wand. In fact, the Judge's Memorandum, discussing Ms. Carter's battery claim, which necessarily requires an intentional touching, states:<br><br>Defendants contend that [Ms. Carter] was not touched, and therefore no battery occurred, but it is not unreasonable to infer that causing an electrical shock to someone may be regarded as a battery whether or not [Deputy Monroe] ever laid a hand on [Ms. Carter].[18]<br><br>Certainly, the State Defendants have read the Judge's Memorandum and don't again mean to suggest that Deputy Monroe did anything less than intentionally use a handheld metal detecting wand on Ms. Carter. Additionally, the State Defendants' repeated reliance on their assertion that there was no physical contact between Ms. Carter and the metal detecting wand is just as nonsensical and preposterous as a criminal claiming that he is not responsible for using a firearm to injure someone because he merely pointed the firearm and pulled the trigger, leaving the bullet to travel on its own. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S DISPUTES |
|---|---|
| *The record in this case, including the indisputable video evidence, demonstrates that the Defendants' actions were lawful, appropriate, and consistent with both their training and the recommendations of the neurostimulator device maker, Medtronic, Inc.* | Ms. Carter has broken the Defendants' Statement to the left down into three subsections, A, B, and C, respectively. Additionally, Ms. Carter notes that the Defendants' heavy reliance on the video surveillance footage they recently produced is not only of extremely poor quality to the point of being unable to determine what, if anything, is being communicated but, just as importantly, because the only video surveillance footage that was produced was recorded from behind Deputy Monroe, his face and body are effectively hidden. |

---

[18] ECF No. 32 at pg. 17.

| A | |
|---|---|
| | As explained more fully in the body of this Opposition to the State Defendants' Motion for Summary Judgment, the State Defendants' actions were not lawful or appropriate, *inter alia*, if they violated the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, or Ms. Carter's constitutional right to access the courts. |

| B | |
|---|---|
| | The State Defendants have not produced their disability procedures that were in effect at the time they violated Ms. Carter's civil rights despite Ms. Carter's discovery requests requiring their production. The current operating procedures for the Circuit Court require that "[i]f the [person with a disability] is unable to be scanned, have them searched by someone of the same gender if possible."[19] Additionally, the State Defendants' own testimony is in direct opposition to the notion that their actions were consistent with their training. Deputy Smith testified: |

Q: When someone presents with a sensitivity to electromagnetic rays or a scanner, is there a specific procedure in place for how they should be treated by the secondary screener?

....

A: If it gets to that point more than often you will request a supervisor.

Q: Did you receive any training that provided that you should pat someone down who has a sensitivity to electromagnetic rays rather than scanning them with the handheld scanner?

A: Yes.[20]

It, however, hardly matters how the State of Maryland trained the State Defendants if the training or execution of the training was done in violation of Ms. Carters rights, *inter alia,* including the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, or Ms. Carter's constitutional right to access the courts.

Additionally, the Food and Drug Administration issued a Public Health Notification on September 28, 1998, titled "Important Information on Anti-Theft and Metal Detector Systems…," which provided, in pertinent part:

We have received 17 reports of overstimulation from implanted spinal-cord stimulators when pass[ing] through security systems.[21]

---

[19] Baltimore City Sheriff's Department Operating Procedures at pg. 00052, attached hereto as Exhibit C.
[20] Deposition of Christopher Smith at pg. 16; 6-10, attached hereto as Exhibit D.

| **C** | |
|---|---|
| | The State Defendants have put a lot of stock in their contention that the manufacturer of Ms. Carter's neurostimulator device, Medtronic, advised that Ms. Carter could be subjected to metal detectors without incident. However, not only have the Defendants materially misrepresented Medtronic's advice, but nevertheless, even assuming, *arguendo*, that they hadn't, it would still be irrelevant as Ms. Carter is the one with the disability that needed to be accommodated by the State Defendants and Ms. Carter, not Medtronic, was in the best position to know what sensitivities her neurostimulator might present. As far as Medtronic's advice, Ms. Carter's Deposition provides:<br><br>Q: Did they give you any advice or information about interacting with certain devices in public? For example, security screens in airport security screenings and courthouse –<br><br>A: Yes. I had to watch out for the amount of microwaves I'm around. Do not stand nowhere near one of those electrical boxes. Watch out for metal detectors, and basically pay attention to the amount of microwaves in your settings.<br><br>Q: And what did they tell you would happen if you were too close to something that emits microwaves?<br><br>A: I run the risk of getting electrocuted.[22]<br><br>The State Defendants also misrepresent the information that they got directly from Medtronic, which they queried Ms. Carter about in her Deposition. The information provides, in pertinent part, as reproduced in Ms. Carter's Deposition:<br><br>Q: …'Will I encounter problems when I pass through the security screening devices and theft detectors?' And this document says, 'When approaching security screening devices and theft detectors in airports, stores, libraries, and other public buildings, request to bypass these devices if at all possible. They may interfere with your neurotransmitter function or detect its metal case.'[23]<br><br>The Medtronic information thereafter provides information on suggested practices if security personnel insist on exposing a neurotransmitter to electromagnetic fields. However, these suggestions in no way take away from the express instructions to "bypass these devices if at all possible" as "[t]hey may interfere with your neurotransmitter..."[24] |

[21] Food and Drug Administration, *Important Information on Anti-Theft and Metal Detector Systems and Pacemakers, ICDs, and Spinal Cord Stimulators*, http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices /PublicHealthNotifications/ucm062288.htm (last accessed March 9, 2015).
[22] Exhibit A at pg. 38; 9-21.
[23] *Id.* at 49-50.
[24] *Id.*

| DEFENDANTS' STATEMENT | PLAINTIFF'S DISPUTES |
|---|---|
| *To reduce the risk of a bad interaction, the neurostimulator is equipped with the capability to temporarily deactivate it with a simple on/off switch.* | While Ms. Carter theoretically had the ability to deactivate her neurostimulator, it is a protracted and embarrassing procedure. Additionally, she would have had to endure the extreme pain that her neurostimulator was implanted to prevent. Ms. Carter's Deposition provides, in pertinent part, as follows:<br><br>Q: Do you have the ability with the belt and those external controls to deactivate your stimulator for a period of time?<br><br>A: Yeah. You can turn it on and off.<br><br>Q: …Did they ever give you instructions or any advice about whether you should turn it off, if you're going to encounter [microwaves]?<br><br>A: If – only if the pain is not bothering me, and it's not going to be a long period of time. But the pain was so severe I never had – I could never turn it off.[25]<br><br>Ms. Carter described the procedure that she would have to endure to turn off her neurotransmitter in her Deposition as well, which provides, in pertinent part:<br><br>A: Let's see. It's a belt you put around your waist.<br>  ….<br>A: And it gets to the battery and you have this little – I guess a little box with different settings…<br>  ….<br>A: It has a little window on it. It has on and off buttons, and then it has settings on the side...[26]<br><br>The idea that it would have somehow been reasonable for Ms. Carter to turn off her neurotransmitter, which was interrupting her extreme pain, is nothing more than and inflammatory attempt by the State Defendants to shift their indisputable burden to accommodate Ms. Carter back onto her. On its face, requiring Ms. Carter to turn off her neurostimulator would have been disability discrimination. |

---

[25] Exhibit A at pg. 39; 1-12.
[26] *Id.* at pg. 35; 4-20.

| DEFENDANTS' STATEMENT | PLAINTIFF'S DISPUTES |
|---|---|
| *[The] back of the [identification] card reads, 'I have an implanted medical device that may set off your airport / security system.' The card does not contain any particular warnings or instructions for security personnel, nor does it state that security personnel should take, or refrain from taking, any particular action when screening the cardholder.* | It is undisputed that Ms. Carter presented her identification card to the Defendants. Regardless of whether Ms. Carter's identification card expressly advised the State Defendants that she could not be exposed to the electromagnetic waves from a metal detector or she advised them orally is immaterial. This is especially true in light of the fact that pursuant to well-settled civil rights law, disabled visitors to the Circuit Court do not need to furnish any proof of their disability. Nevertheless, Ms. Carter's Deposition provides, in pertinent part:<br><br>A: I explained to him – I showed him my card, and I said, "I definitely cannot go through your metal detector."[27]<br><br>In Judge Brendar's discussion of Deputy Monroe's use of a metal detecting wand, which is likewise applicable to being told to squeeze around the side of the stationary metal detector, the Judge's Memorandum provides, in pertinent part:<br><br>The Defendants make an equally implausible, and even more bizarre, argument that [Ms.] Carter was given alternate screening in the form of a metal detecting wand rather that being forced to walk through the metal detector. This assertion reveals a lack of comprehension as to the nature of [Ms.] Carter's disability and what would constitute a reasonable accommodation for it since it is abundantly clear that a metal detector wand presents the same risk of injury to [Ms.] Carter as does a stationary, walk through metal detector. [28]<br><br>Both the walk through metal detector and the metal detecting wand emit electromagnetic waves. Not only should the Defendants have known that Ms. Carter could not be exposed to electromagnetic waves of any kind following the presentation of her identification card, which identifies her as having an implanted neurotransmitter, but even if they were not familiar with a neurotransmitter itself, Ms. Carter expressly informed the State Defendants that because she had an implanted neurostimulator, she "cannot go through your metal detector." |

---

[27] *Id.* at pg. 90; 1-3.
[28] ECF No. 32 at pg. 10.

| DEFENDANTS' STATEMENT | PLAINTIFF'S DISPUTES |
|---|---|
| *The Plaintiff testified that she was advised by whomever she spoke to [at the Civil Liberties Office] that she should simply show the deputy at the security desk her Medtronic identification card and that she should be permitted to pass around the outside of the magnetometer. She did not object to or question the alleged instruction, nor did she request any alternative.* | Ms. Carter is not an expert at what accommodations are reasonable for her disability. The State Defendants are again trying to shift their burden to provide Ms. Carter with a reasonable accommodation back on Ms. Carter. Additionally, there is a material difference between "passing around" and "squeezing by" the exterior of a walk through metal detector, which could easily be the difference of hundreds of feet depending on placement of the walk through metal detector in relation to the rest of a structure. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S DISPUTES |
|---|---|
| *After experiencing the burning sensation, Ms. Carter testified that she immediately thought, 'Oh, you're so stupid. Oh, I'm so dumb.'* | Again, the State Defendants are trying to shift their burden to reasonably accommodate Ms. Carter back on her. Because the burden was the State Defendants and the Sate Defendants alone, it doesn't matter how "stupid" or "dumb" Ms. Carter felt for trusting the State Defendants that they were providing her with a reasonable accommodation, which encompasses Ms. Carter's safe passage. It is reasonable to believe that most people would feel "stupid" and "dumb" when they trusted someone and then sustained serious injuries. This is especially true where law enforcement are involved because civilians are conditioned to blindly trust law enforcement by virtue of the uniforms they wear and the authority they wield by displaying handguns and mechanical restraints. |

| DEFENDANTS' STATEMENTS | PLAINTIFF'S DISPUTES |
|---|---|
| *Subsequent to experiencing the burning sensation and sitting down, Ms. Carter testified that the deputy asked her if she was okay, and that she told him that she wanted to continue on to her divorce proceeding and did not require any help. Ms. Carter sat for a short time, went upstairs to attend her court proceeding, and then left the building without notifying any courthouse of Sheriff's Office personnel of the incident. When asked why she didn't make a complaint about the incident, Ms. Carter testified, 'because I just thought it was my stupid luck.'* | Again, the State Defendants are trying to shift the burden upon Ms. Carter to put the State Defendants on notice of an incident that they not only witnessed, but caused. The State Defendant that witnessed Ms. Carter being injured had a duty to make a report, not Ms. Carter. Additionally, contrary to the State Defendants' assertions that Ms. Carter simply "sat for a short time, went upstairs to attend her court proceeding and then left the building," she testified in her Deposition that she "hobbled upstairs" with "stabbing pain going up and down [her] leg."[29] When Ms. Carter got to the courtroom, she was "rocking back and forth, back and forth" in pain.[30] Ms. Carter commented that she "had been electrocuted" and that the pain was so bad that she "would take [her] leg off and leave it if she could."[31] Clearly, the State Defendants' attempts to paint Ms. Carter's injuries as superficial and something that reasonably could have flown under the State Defendants' radar is contradicted by Ms. Carter's express testimony. |

---

[29] Exhibit A at pg. 70; 15-20.
[30] *Id.* at pg. 71; 10.
[31] *Id.* at pg. 74; 11-16.

| DEFENDANTS' STATEMENTS | PLAINTIFF'S DISPUTES |
|---|---|
| *Plaintiff had the work schedule as early as May 2014, and elected not to depose other deputies who appeared on it that may have possibly been posted in that location.* | Ms. Carter can neither afford nor does she believe that it would have been reasonable to depose scores of the other deputies on the work schedule on the day of the first incident. Additionally, the State Defendants are again trying to shift the burden back on Ms. Carter by suggesting that she do what they claim to have already done. No one will ever know what the outcome would have been if Ms. Carter had somehow deposed all the deputies working in the Circuit Court on the day in question. However, it is troubling that the State Defendants on the one hand claim that they did a diligent investigation into which deputy interacted with Ms. Carter on the day of the first incident and, on the other, brazenly assert that had Ms. Carter done an investigation through scores of depositions, it might somehow have been more fruitful. |

| DEFENDANTS' STATEMENTS | PLAINTIFF'S DISPUTES |
|---|---|
| *When [Ms. Carter] finally saw her treating physician, Dr. Ira Garonzic, and explained to him what had occurred at the courthouse, she testified that he described her experience as 'odd' and had no idea why she felt the burning sensation upon passing around the outside of the metal detector. As a result, he advised her to see a Medtronic technician.* | Ms. Carter's physician, Ira Garonzic, has not been designated as an expert on the functionality of Ms. Carter's neurostimulator. Much like an automotive mechanic that has the ability to replace an automobile's onboard computer or some of the components in an automobile's onboard computer system, that does not necessarily also mean that they are an expert when it comes to the programming of the automobile's computer system. Therefore, it should come as no surprise that Dr. Garonzic "had no idea why [Ms. Carter] felt a burning sensation]." It is also worth noting, that there is a fundamental difference in not knowing why a particular event happened and knowing that if certain conditions are met, *i.e.*, exposure to microwaves, that there is the potential for a certain result, *i.e.*, interference with the functioning of a neurotransmitter. |

| DEFENDANTS' STATEMENTS | PLAINTIFF'S DISPUTES |
|---|---|
| *According to Ms. Carter, the Medtronic technician was equally puzzled regarding why she had experienced the burning sensation – she testified that he literally scratched his head in disbelief.* | The Medtronic technician has not been designated as an expert either and, even if he had been, the fact that he was "puzzled" and "in disbelief" has no relevance as to whether Ms. Carter was given a reasonable accommodation. This is especially true in light of the Medtronic technician's express instructions to Ms. Carter to avoid metal detectors, Medtronic's express instructions to "request to bypass metal detectors," and the express warnings issued by Federal agencies addressing neurotransmitters and exposure to metal detectors. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S DISPUTES |
|---|---|
| *Deputy Monroe testified that he picked up the handheld wand and prepared to screen Ms. Carter when she stepped back and claimed to have been shocked. Deputy Monroe was clear in his testimony that had Ms. Carter objected to the use of the handheld wand, he would have simply called for a supervisor per Sheriff's Office policy.* | Deputy Monroe's made numerous self-serving speculations in his Deposition about what he may or may not have done when he encountered Ms. Carter. However, he didn't specifically remember any discussions he had with Ms. Carter, save him telling her "how she looked nice" in her "white dress shirt." Deputy Monroe, thereafter, stated:<br><br>A: …[H]ypothetically speaking, we would have – if [Deputy] Smith knew what [Ms. Carter] was there for, which from my understanding was a divorce, you know, we probably would have…[said] hey, look, you're getting divorced...do you want another husband…?[32]<br><br>In stark contrast to Deputy Monroe's speculations and his preoccupation with sexually harassing woman who present themselves to him for alternate screening, Ms. Carter does remember her discussions with Depute Monroe. Ms. Carter's Deposition provides, in pertinent part:<br><br>A: I'm facing him because he grabbed the mag detector. I'm like, "He said my coat, not me." He said, "Ma'am, my job is," and that is when I raised my hand up.<br>….<br>A: "Ma'am my job is."<br><br>Q: So he is moving the [handheld metal detector] while he is talking to you?<br><br>A: Right.<br>….<br>A: …He had it close to him, and I'm standing back like this telling him, "Sir, you cannot wand me with that. I can't go through the metal detector." "Ma'am my job is." So, I told him what his job was.<br><br>A: He said, "Ma'am, but my job is to wand civilians when they come in." I said, "Sir, I got to get to the courtroom." I had my hands up. "Just go get me a female." So, when I went to go reach for my coat, he came down with his arm.<br>….<br>A: I turned to get my coat and his hand came down with that wand thing. And it was like I got zapped.[33] |

---

[32] Deposition of Freddie Monroe at pg. 29; 9-17. Attached hereto as Exhibit E.
[33] Exhibit A at pgs. 94-7.

*STANDARD OF REVIEW*

Summary judgment may be granted "only where it is perfectly clear that no issue of fact is involved."[34] In the Fourth Circuit, "[i]t is well established that ... 'circumstantial evidence is no less probative than direct evidence' " in creating genuine disputes of material fact.[35] "Even if there is no dispute as to the evidentiary facts, summary judgment is inappropriate if there is a dispute as to the conclusions to be drawn from such facts."[36] Put differently, summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[37] Here, Ms. Carter's Counter-Statement of Disputed Material Facts, Ms. Carter's Deposition testimony, the disposition testimony of the State Defendants, and the relevant federal warnings and regulations indisputably demonstrate that there are, at a minimum, genuine issues of material fact concerning the Defendants' liability, *inter alia,* for their manifest failure to reasonably accommodate Ms. Carter's disability and their denial of Ms. Carter's constitutional right to access the courts; these issues of material fact preclude the grant of summary judgment as to any of the causes of action asserted any of the State Defndants. Further, the State Defendants have not each met their burden of proof on their Motion for Summary Judgment nor have they established a lack of culpability – the State Defendants' Statement of Undisputed Facts is rife with blatant factual inaccuracies and substantially relies on unsupported sweeping conclusions, many of which would necessitate expert testimony, which the State Defendants have not and now cannot submit.

As the non-movant, Ms. Carter is "entitled ... to have the credibility of her evidence as forecast assumed, her version of all that is in dispute accepted, all internal conflicts in it resolved favorably to her, the most favorable of possible alternative inferences from it drawn in her behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered."[38] "If... the defendant disputes the plaintiffs' version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of [summary judgment]."[39]

The vast majority of Ms. Carter's claims are typically decided by juries, not judges, and the Defendants have manifestly failed to identify any reason why this case should be an exception to this rule. The Court may not "weigh the evidence or evaluate the credibility of witnesses."[40] The Court may

---

[34] *Gill v. Rollins Protective Services Co.,* 773 F.2d 592 (4th Cir. 1985) (internal quotations and citations omitted).
[35] *Buonocore v. Harris,* 134 F.3d 245, 251 n.1 (4th Cir. 1998) (Motz, J.) (internal citation omitted).
[36] *Magill v. Gulf & Western Industries, Inc.,* 736 F.2d 976, 979 (4th Cir. 1984).
[37] Fed. R. Civ. P. 56(c).
[38] *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979).
[39] *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002).
[40] *Caboni v. General Motors Corp.,* 278 F.3d 448, 451 (5th Cir. 2002).

not grant summary judgment unless "no reasonable juror could find for" Ms. Carter.[41] Additionally, intent, which "depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving," is "seldom appropriate" for summary adjudication.[42] Likewise, "[i]t is well settled that causation is ordinarily left for a jury to determine,"[43]

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

---

[41] *Caboni,* 278 F.3d at 451.
[42] *Id.*
[43] *Knussman v. Maryland,* 272 F.3d 625, 652 (4th Cir. 2001); *see also Brown v. Philip Morris Inc.,* 250 F.3d 789, 811 (3d Cir. 2001) ("causation and intent [are] classic issues of fact to be resolved by a factfinding jury and not by judicial prescreening").

*ARGUMENT*

I. **THE DEFENDANTS VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT.**

A. **THE PLAINTIFF'S FEDERAL DISABILITY DISCRIMINATION CLAIMS**

The parties are in agreement that for Ms. Carter to ultimately recover damages on her federal disability discrimination claims, she must prove that:

(1) she has a disability;

(2) that she is otherwise qualified to receive the benefits of a public service, program, or activity; and

(3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability.[44]

The State Defendants do not contest that Ms. Carter is disabled within the meaning of the first prong or that she was otherwise qualified to receive the benefits of a public service, program, or activity within the meaning of the second prong. As to the third prong, however, the State Defendants maintain that Ms. Carter was not "excluded from participation in a public entity's services, programs or activities, or otherwise discriminated against."

Specifically, the State Defendants argue that "the record is devoid of evidence that Ms. Carter was discriminated against or effectively excluded from attending court" as "she was not made to pass through the walk-through magnetometer and that her disability was reasonably accommodated." The State Defendants also focus on Medtronic's instructions and, again misrepresenting them to this Court, claim that "the device maker expressly sanctioned [the use of metal detectors]" and that "Deputy Manroe [should not be] held responsible when Ms. Carter's own healthcare providers and a Medtronic representative had no idea why she experienced the burning sensations." Finally, the Defendants contend that "no reasonable factfinder could view Deputy Manroe's conduct as giving rise to a 'strong likelihood' that a violation of Ms. Carter's civil rights would occur."

The State Defendants' characterization of Ms. Carter's claims and their arguments against the finding of liability again reveal a disturbing misunderstanding of the relevant law as applied in the Fourth Circuit. "With regard to the third prong of a disability discrimination claim, the Fourth Circuit has recognized three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations."[45] Even if the State Defendants are

---

[44] *Adams v. Montgomery County,* 834 F. Supp. 2d 386, 393 (D. Md. 2011).
[45] *Id.* at 393.

correct that Ms. Carter has not established that she suffered intentional disparate treatment or disparate impact, she unquestionably *has* proven that the State Defendants failed to make reasonable accommodations.

The requirement that a public entity make reasonable accommodations for disabled individuals finds support in the implementing regulations of Title II of the Americans with Disabilities Act, which provides, in pertinent part, that:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[46]

Based on this provision, the Fourth Circuit has held that Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act require public entities to make reasonable accommodations for persons with disabilities.[47]

The substance of any advice given to Ms. Carter by her medical providers or Medtronic about how she should proceed through security checkpoints and the fact that Ms. Carter was not "forced" to pass through the walk-through metal detector do not provide the State Defendants with an escape hatch for their failure to reasonably accommodate Ms. Carter's known disability. Additionally, the State Defendants have, as discussed more fully above, misrepresented the substance of the warnings communicated to Ms. Carter, which expressly provided that if she was exposed to microwaves and/or went through a metal detector, she might be shocked. Regardless of what Medtronic and Ms. Carter's physicians advised her and regardless of whether the State Defendants recognized their duty at the time, the State Defendants indisputably agreed to accommodate Ms. Carter's disability, but failed to do so on both occasions. To that end, Judge Bredar's Memorandum provides, in pertinent part, that:

> [The] Defendants do not contest either the first or second element. Instead they rest on a strangely curious argument as to the third element. They claim that, in fact, [Ms.] Carter was afforded access to the courts because, after all, she managed to arrive at the courtroom where her case was being heard. But, surely, the right of access must include the right to arrive in the courtroom uninjured by courthouse security officers. Otherwise, the right to access is meaningless. The Supreme Court, in addressing the question of § 504 of the Rehabilitation Act, noted that its prior precedent 'requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers.' [Ms.] Carter has sufficiently alleged that she was denied meaningful access to the courts on the basis of her disability. Defendants' Motion to Dismiss Count Three will be denied as to the

---

[46] *Id.*, citing 28 C.F.R. § 35.130(b)(7).

[47] *Id.*

State [of Maryland] and the other State Defendants in their official capacities.

Defendants make an equally implausible, and even more bizarre, argument that [Ms.] Carter was given alternate screening in the form of the metal detector wand rather than being forced to walk through the metal detector. This assertion reveals a lack of comprehension as to the nature of [Ms.] Carter's disability and what would constitute a *reasonable* accommodation for it since it is abundantly clear that a metal detector wand presents the same risk of injury to [Ms.] Carter as does a stationary, walk through metal detector.[48]

While it seems obvious, Ms. Carter nonetheless notes that squeezing alongside the outside of a walk through metal detector likewise presented the same dangers to Ms. Carter as a walk through metal detector and a metal detecting wand.

Judge Bredar continued:

Access to the courts is a constitutional right that the Defendants have somehow overlooked, and without question, it has been clearly established for a long time…As noted earlier, the right can only be considered meaningful unless it also embraces the right to access the courts without being subjected to severe injury by courthouse security officers. The Complaint alleges that the courthouse security officers were aware of the need for special screening of [Ms.] Carter as evidenced by her presentation of the special identification card and by the [courthouse security] officer's statements.[49]

For these reasons and the reason set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

## B.    THE STATE DEFENDANTS DISCRIMINATORY INTENT AND COMPENSATORY DAMAGES

In general, "[p]laintiffs are entitled to a 'full panoply' of legal remedies under Title II of the ADA or § 504 of the Rehabilitation Act."[50] Case law in this district supports applying the deliberate indifference standard in cases involving a failure to accommodate individuals with disabilities.[51]   In *Proctor v. Prince Georges' Hosp. Ctr.*, this Court held that "the level of proof necessary for finding

---

[48] ECF No. 32 at pg. 10.

[49] *Id.* at 13-4.

[50] 834 F. Supp. 2d 386, 393 (D. Md. 2011) citing *Pandazides v. Va. Bd. of Educ.,* 13 F.3d 823, 829-30 (4th Cir. 1994); *Torcasio v. Murry*, 57 F.3d 1340, n. 2 (4th Cir. 1995)(recognizing that "remedies available for ADA violations are those available for Rehabilitation Act violations").

[51] *Id.*

intentional discrimination under the Rehabilitation Act means a deliberate indifference to a strong likelihood that a violation of federal rights would result."[52]

The State Defendants argue that that "the record is devoid of evidence that Ms. Carter was discriminated against or effectively excluded from attending court." According to the Defendants, in both instances "where [Ms. Carter] experienced pain or discomfort, *she was not made to pass through the walk-through magnetometer and her disability was reasonably accommodated*."

Once again, the State Defendants' arguments reveal a disturbing misunderstanding of the relevant law as applied in the Fourth Circuit. "[D]efendants intentionally violate the ADA and Rehabilitation Act by demonstrating deliberate indifference when they 'have notice of the potential risk of their decision, and clearly [refuse] the accommodation knowingly."[53] "The Defendants need not have shown 'discriminatory animus' for [Ms. Carter] to recover damages under Title II of the ADA or § 504 of the Rehabilitation Act."[54] Rather, as this court explained in *Proctor*, compensatory damages are available for failure to accommodate a plaintiff if the defendants "acted 'knowingly, voluntarily, and deliberately,'" even if the violations resulted from mere "'thoughtlessness and indifference' rather than because of any intent to deny the [p]laintiff's rights."[55]

The issue  is not whether Ms. Carter was made to pass through the walk through metal detector, but rather, whether the state Defendants granted Ms. Carter reasonable accommodations on both occasions. It simply does not follow, as the State Defendants have repeatedly asserted, that because an accommodation was granted, that it was a reasonable accommodation.

Ms. Carter indisputably informed the State Defendants of her disability and her need for reasonable accommodations, which the State Defendants not only concede, but acknowledged at the time by instructing Ms. Carter to walk around the walk through metal detector on both occasions.  These facts are sufficient to prove that the State Defendants displayed deliberate indifference by knowingly refusing to accommodate Ms. Carter, despite having notice of the potential risks, as evidenced by the presentation of Ms. Carter's disability card, Ms. Carter's express statements, and the State Defendants' instructions on both occasions for Ms. Carter to walk around the walk through metal detectors.[56]  Because the evidence

---

[52] *Id.*; 32 F.Supp.2d 820, 829 n. 6  (D.Md.1998).

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *See, e.g.,* Paulone, 787 F. Supp. 2d at 387-88 (holding plaintiff's allegations that detention center personnel refused to accommodate her stated a claim of deliberate indifference under the Americans with Disabilities Act because defendant police officers were aware of deaf plaintiff's disability, and because the sheriff's office policy calling for reasonable accommodations for deaf detainees put them on notice of potential liability); *Proctor,* 32 F.Supp.2d at 828 (holding compensatory damages available for deaf plaintiff under Section 504 of the Rehabilitation Act because defendant hospital refused to accommodate her despite being aware of her disability, and because a past complaint put the hospital on notice of potential liability).

set forth by Ms. Carter supports the conclusion that the State Defendants exhibited deliberate indifference on both occasions, Ms. Carter has made the showing required in order to pursue compensatory damages under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

### C.    THE STATE OF MARYLAND RECEIVES FEDERAL FUNDS

In the ever-mounting line of ridiculous arguments made by the State Defendants in their Motion for Summary Judgment, they attempt to claim that Ms. Carter cannot prove that the State of Maryland has received any federal funds as required for her to recover damages under Section 504 of the Rehabilitation Act. Ms. Carter, however, need not look any further than the Maryland Governor's Grants Office Annual Report, which even includes a grant to sheriffs for community oriented policing services.[57]

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

## II.    THE RECORD ESTABLISHES A VIABLE DUE PROCESS "ACCESS TO THE COURTS" CLAIM AND THE STATE DEFENDANTS DO NOT ENJOY QUALIFIED IMMUNITY.

### A.    THE STATE DEFENDANTS DO NOT ENJOY QUALIFIED IMMUNITY

Qualified immunity may shield government officials from personal liability in certain circumstances for performing discretionary functions, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[58] Whether such an official may legitimately claim qualified immunity for an allegedly unlawful action "generally turns on the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken."[59]

> The right of the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action is question has previously been held

---

[57] *See* Maryland Governor's Grants Office Annual Report, http:// http://grants.maryland.gov/Annual%20Report/ 2014/GGO_AnnualReport_2014.pdf (last accessed March 9, 2015).
[58] ECF No. 32 at pg. 13, citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).
[59] *Id.*

unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.[60]

The first inquiry is whether a constitutional right would have been violated on the facts viewed in the light most favorable to the non-moving party, Ms. Carter. In adjudicating the Defendants' Motion to Dismiss, Judge Brendar commented, in pertinent part:

> Astoundingly, the Defendants argue that 'there is no constitutional right that would have been violated on the facts alleged by the Plaintiff.'[61]

His Honor continued, explaining that "[a]ccess to the courts is the constitutional right that the Defendants have somehow overlooked, and, without question, it has been clearly established for a long time."[62] Thus, His Honor found that "the first inquiry is resolved in [Ms.] Carter's favor."[63]

The second inquiry is "whether it would be clear to an objectively reasonable officer that his conduct violated the right."[64] Again, quoting Judge Brendar:

> As noted earlier, the right can only be considered meaningful unless it also embraces the right to access the courts without being subjected to severe injury by courthouse security officers.
>
> The Complaint alleges that the courthouse security officers were aware of the need for special screening of [Ms.] Carter as evidenced by her presentation of the special identification card and by the officers' statements. Recognition of the need for special screening showed that the officers also appreciated the need for a disabled person's access to the courts. The qualified immunity defense is not plausible.[65]

As noted above, the material facts underlying Ms. Carter's claims have not changed. The State Defendants were just as aware of the need for special screening of Ms. Carter when their Motion to Dismiss was adjudicated as they are today and nothing they have asserted has demonstrated or even hinted that the State Defendants did not appreciate the need for Ms. Carter's access to the courts.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

---

[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*, citing *Willingham v. Crooke*, 412 F.3d. 553, 558 (4th Cir. 2005).
[65] *Id.*

**B.        THE PLAINTIFF WAS DENIED ACCESS TO THE CIRCUIT COURT.**

Throughout the State Defendants' Motion for Summary Judgment there are obvious attempts to recast the State Defendants' culpability upon Ms. Carter as a disabled civilian visitor, and with knowingly false information. Illustrative examples include the State Defendant's repeated assertions that Medtronic instructs its patients that a handheld magnetometer can be used on them, and that patients should ask security personnel to move the handheld wand as quickly as possible when near the transmitter site. In addition, the State Defendants argue that Ms. Carter  testified that she had the ability to temporarily turn off her neurotransmitter. These statements clearly flunk the litmus test for cluelessness, especially in light of the Food and Drug Administration's public health notification warning of severe spinal-cord stimulator interactions when persons with these devices passed through security systems.[66] By definition, the Due Process Clause of the United States Constitution (*hereinafter,* the "Due Process Clause") and the Americans with Disabilities Act required the State Defendants to reasonably accommodate Ms. Carter as a disabled civilian visitor. Ms. Carter's requested accommodations were granted on both March 28, 2012, and November 17, 2011. It is that simple. Ms. Carter is not an expert and as a disabled civilian visitor requested a reasonable accommodation that was granted. The probability of her being shocked is not at issue. The fact is that she was shocked after the State Defendants agreed to provide her with reasonable accomidations is what is at issue. Additionally, the State Defendants adding that Ms. Carter could have turned off her neurotransmitter prior to presenting for screening is one of the most ignorant things that the State Defendants could have asserted, especially because the State Defendants are acutely aware that turning off Ms. Carter's neurotransmitter would require Ms. Carter to do all sorts of finagling of the neurotransmitter behind her back with another apparatus and would have caused extreme embarrassment and severe pain to Ms. Carter as she would not have had the benefit of the neurotransmitter from the time she disabled the unit until the time she was cleared for entry into the courthouse and could enable the unit, which indisputably would not have been reasonable by any measure.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

---

[66] Food and Drug Administration, *Public Health Notification – Important Information on Anti-Theft and Metal Detector Systems and Pacemakers, ICDs, and Spinal Cord Stimulators*, September 28, 1998, attached hereto as Exhibit A.

## C.    THE INTERPLAY OF THE DUE PROCESS CLAUSE AND THE AMERICAN'S WITH DISABILITIES ACT AS THEY RELATE TO COURTHOUSE SECURITY.

Among the rights protected by the Due Process Clause is the right of access to the courts. For criminal defendants, the Due Process Clause has been interpreted to provide that "an accused has a right to be present at all stages of the trial where her absence might frustrate the fairness of the proceedings."[67] Parties in civil litigation have an analogous due process right to be present in the courtroom and to meaningfully participate in the process unless their exclusion furthers important governmental interests.[68] Further, those who fail to appear in court may not be sanctioned for failing to appear until they have been accorded due process.[69]  These guarantees are protective of equal justice and fair treatment before the courts.

The Supreme Court of the United States (*hereinafter*, the "Supreme Court") has found a right of access inherent in numerous constitutional provisions, including the Due Process Clauses, the Privileges and Immunities Clause of Article IV, and the First Amendment. Moreover, the Supreme Court has made clear that this right of access is a right of equal access.[70] Persons with disabilities are entitled to the benefit of this right of access no less than any other persons. Title II of the Americans with Disabilities Act is a constitutionally appropriate implementation of that constitutional guarantee.

The Supreme Court has articulated at least four distinct ways in which the United States Constitution protects a right of access to the courts. First, under the First Amendment, the public has the right to attend and observe judicial proceedings.[71] Openness to all the public, which this the Supreme Court has called "one of the essential qualities of a court of justice," ensures that the judicial system is perceived to be fair and deserving of public confidence.[72] "[T]he means used to achieve justice must have the support derived from public acceptance of both the process and its results."[73]

Second, the Due Process Clause secures the right to initiate proceedings in court to seek judicial relief from unlawful treatment at the hands of the government. This issue has arisen most frequently in the context of prisoner access to the courts, but the Supreme Court has recognized that the right of prisoner access is simply one part of a more general "right of access to the courts, … [which] is founded in the Due Process Clause and assures that no person will be denied the opportunity to present

---

[67] *Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

[68] *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808, 813-14 (2002); *Helminski v. Ayerst Labs.*, 766 F.2d 208, 213 (6th Cir.), cert. denied, 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985).

[69] *Groppi v. Leslie*, 404 U.S. 496, 502, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972).

[70] *Griffin v. Illinois*, 351 U.S. 12, 16 (1956) (plurality opinion).

[71] . *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (opinion of Burger, C.J.).

[72] *Id.* at 567 (citation omitted),

[73] *Id.* at 571.

to the judiciary allegations concerning violations of fundamental constitutional rights."[74]

Third, the Due Process Clause prevents the States from obstructing any individual's "[r]esort to the judicial process" when that process is central to "interests of basic importance in our society."[75] In *Boddie*, the Supreme Court invalidated a requirement that litigants pay filing fees and costs, when that requirement effectively prevented indigent persons from bringing an action for divorce.[76] In finding that access to the courts was a central aspect of due process, the Supreme Court explained the central role of the courts in securing individuals' rights and duties:

> Perhaps no characteristic of an organized and cohesive society is more fundamental than its erection of a system of rules defining the various rights and duties of its members, enabling them to govern their affairs and definitively settle their differences in an orderly, predictable manner…. It is to the courts, or other quasi-judicial official bodies, that we ultimately look for the implementation of a regularized, orderly process of dispute settlement.[77]

Finally, when important interests are at stake in judicial proceedings, the Due Process Clause requires more than a theoretical right of access to the courts; it requires meaningful access. "[P]ersons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard."[78] To ensure meaningful access, particularly when an individual faces the prospect of deprivation through the judicial process of life, liberty, or property, due process often requires the State to give a litigant affirmative assistance so that he may participate in the proceedings if he effectively would be unable to participate otherwise.[79] Even when due process does not obligate the State to establish an avenue of judicial redress (such as an appeal), once the State does so, "these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts."[80]

Thus, the State may not insist on court fees and costs when to do so would prevent an indigent person from defending against a "devastatingly adverse action" in court, such as a possible deprivation of parental rights or loss of liberty.[81] Similarly, when an indigent man is confronted with a paternity action and cannot pay for blood tests that would dispel a presumption that he is the father, due process requires the State to shoulder the cost of the tests.[82] And it has long been understood that, as a matter of

---

[74] *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974); see also *Bounds v. Smith*, 430 U.S. 817, 821-822 (1977).
[75] *Boddie*, 401 U.S. at 376.
[76] *Id*. at 374.
[77] *Id*. at 374-375.
[78] *Boddie*, 401 U.S. at 377.
[79] *See M.L.B. v. S.L.J.*, 519 U.S. 102, 125 (1996); *id*. at 128-129 (Kennedy, J., concurring in the judgment).
[80] *Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966).
[81] *See M.L.B.*, 519 U.S. at 125; *Burns v. Ohio*, 360 U.S. 252 (1959); *Griffin*, 351 U.S. 12.
[82] *See Little v. Streater*, 452 U.S. 1, 14-15 (1972).

due process, the State must provide assistance, such as an interpreter, to one who could not otherwise understand the proceedings in his criminal trial.[83]

The principle that the State must provide equal access to the courts is equally applicable to persons with disabilities. A person with a disability who faces the loss of his freedom, children, or property in a judicial proceeding similarly must have meaningful access to the courts. He cannot be said to enjoy equal and effective access to the courts unless he can actually attend, follow, and participate in the proceeding. Meaningful, not merely theoretical, access to the courts is required by the Constitution. If someone who has a neurotransmitter has it shocking them repeatedly to and within the courtroom where their rights and interests are at stake or does not have the benefit of their neurotransmitter because it has been damaged by the State Defendants, they have no more access to justice than does the indigent person who cannot pursue an appeal because he lacks the funds for the filing fee.

Additionally, it is not difficult to perceive the harm that Title II was designed to address.[84] Title II of the Americans with Disabilities Act was enacted against the background of a history and pattern of discrimination by the States against the disabled in which "[t]he courthouse door" was literally "still closed to Americans with disabilities."[85] The legislative record of the Americans with Disabilities Act contains numerous references to state failure to make courts and courthouses accessible to individuals with disabilities. In one notable instance, a witness at a congressional hearing testified that she "went to the courtroom one day and … could not get into the building because there were about 500 steps to get in there."[86]And as Justice Breyer noted in his dissent in *Garrett*, the legislative record of the ADA sets forth numerous other instances of States' failures to make courthouses accessible—including failures to provide interpreter services for people who are deaf, to accord adult victims of abuse with developmental disabilities their equal right to testify in court, to provide amplified sound systems in courtrooms, to install access ramps and curb cuts in courthouse areas, and to enable an individual using a wheelchair to obtain a marriage license when the courthouse was not wheelchair accessible.[87]

The evidence before Congress when it enacted Title II of the Americans with Disabilities Act established that physical barriers in government buildings, including courthouses and in the courtrooms themselves, have had the effect of denying disabled people the opportunity to access vital services and to exercise fundamental rights guaranteed by the Due Process Clause. By severely injuring Ms. Carter

---

[83] *See United States ex rel. Negron v. New York*, 434 F.2d 386, 389-390 (2d Cir. 1970); *People v. Aguilar*, 677 P.2d 1198, 1203-1204 (Cal. 1984).

[84] *Tennessee v. Lane,* 541 US 509, 523 (2004).

[85] Staff of the House Comm. on Educ. and Labor, 101st Congress, 2d Sess., Legis. Hist. of Pub. L. No. 101-336: The Americans With Disabilities Act, 100th Cong., 2d Sess. 936 (Comm. Print 1990) (Sen. Harkin).

[86] *Id.* at 1070-1071 (Emeka Nwojke).

[87] 531 U.S. 356, 377-382 (2001).

as she attempted to negotiate the State Defendants' screening process, she was indisputably denied the opportunity to access vital services and to meaningfully exercise her fundamental rights.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

## III.    PLAINTIFF'S STATE CONSTITUTIONAL CLAIMS ARE VIABLE IN    LIGHT    OF THE RECORD EVIDENCE.

The State Defendants have completely disregarded Judge Brendar's finding in his December 3, 2012, Memorandum of Law, which provides, in pertinent part, that:

> [Deputy Monroe] stands on different footing from the other Defendants. [Ms.] Carter has plausibly alleged that [Deputy Monroe] engaged in conduct either with malice or gross negligence when he…specifically disregarded the instruction to provide a pat-down screening to [Ms.] Carter instead of employing metal detectors.

Judge Brendar correspondingly held that "[Deputy Monroe] was not entitled to claim state personnel immunity in Counts Six through Eleven" and that "[Ms.] Carter has sufficiently alleged that [Deputy Monroe] denied her access to the courts in violation of the Maryland Declaration of Rights, Articles 19 and 24..."

Curiously, the State Defendants  ask this Court to completely disregard Ms. Carter's claim arising under Article 19 of the Maryland Declaration of Rights, arguing that Article 19  "does not necessarily support a private cause of action and monetary remedies."  However, regardless of the State Defendants strained reading of the relevant case law, Judge Brendar has already found that on the facts before the Court, Ms. Carter had alleged and has now established sufficient facts to prove her claims arising under Article 19. Thus, as to Ms. Carter's claims arising under Article 19, Judge Brednar's holding should not be disturbed.

The State Defendants also challenge Ms. Carter's claim arising under Article 24 of the Maryland Declaration of rights, which Judge Brendar likewise found was viable on the facts Ms. Carter alleged and has established sufficient evidence to prove. The State Defendants argue  that there "is absolutely no evidence to establish that Deputy Monroe engaged in an activity that violated one of Ms. Carter's Maryland Constitutional rights" or "that Deputy Monroe engaged in such activity with actual malice."  As to the State Defendants' first argument, clearly, and despite the great pains that Judge Brendar went to educate them to the contrary, the State Defendants still insist that access to the courts is not a constitutional right. However, the State Defendants need not look any further than *Johnson v. Maryland State Police*, which provides that "Article 19 does guarantee access to the courts."

As to the second prong of the Defendants' argument, "that Deputy Monroe [did not engage] in such activity with actual malice," not only did Judge Brendar find that on the facts  Ms. Carter alleged and now has established, that "Deputy Monroe" engaged in conduct either with malice of gross negligence," but just as importantly, citing the case law relied on by the State Defendants, *Davis v. DiPino*, "[i]n the absence of a statute, an official who violates an individual's rights under the Maryland [C]onstitution is not entitled to any immunity, and …the presence or absence of malice is pertinent only to the question of punitive damages." Not only have the State Defendants not asserted any entitlement to immunity as to Ms. Carter's claims arising under the Maryland Constitution, but, even if they had, Judge Brendar has previously ruled that on the facts before him, which have been established by the evidence presented herein, that Deputy Monroe is not entitled to immunity.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

## IV.    THE PLAINTIFF WAS DENIED MEDICAL CARE AND DEPUTY MONROE NEITHER ENJOYS  COMMON LAW PUBLIC OFFICIAL IMMUNITY NOR DOES HE ENJOY STATE PERSONNEL IMMUNITY FROM SUCH A CLAIM.

### A.    DEPUTY MONROE ENJOYS NEITHER STATE PERSONNEL IMMUNITY NOR COMMON LAW PUBLIC OFFICIAL IMMUNITY.

As discussed more fully in the Judge's Memorandum, state personnel immunity provides protection for state personnel from suit and from liability for tortious conduct committed within the scope of their public duties and without malice or gross negligence.[88] As observed by Judge Brendar in his discussion regarding immunities in relation to Count Three, state personnel immunity is properly assertable by a defendant  sued in his or her individual capacity, but not in one's official capacity.

Either malice or gross negligence may defeat state personnel immunity.[89] In Maryland, "malice" is defined as "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud" and "can exist even when the conduct is objectively reasonable."[90] "Gross negligence" is defined as:

> [A]n intentional failure to preform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts

---

[88] Md. Code Ann., Cts. & Jud. Proc. § 5-522(b).
[89] *Id.*
[90] *Lee*, 863 A.2d at 311.

injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.[91]

While Judge Brendar found that "[n]one of [Ms.] Carter's allegations support an inference that John Does 1 and 2 acted with malice or gross negligence" and that they were "entitled to claim immunity as to Counts Six through Eleven," he also found that Deputy Monroe "stands on different footing from the other Defendants."[92] Specifically, Judge Brendar found and Ms. Carter has produced sufficient evidence herein to support, that "[Deputy Monroe] engaged in conduct either with malice or gross negligence…when he disregarded the instruction to provide a pat-down screening to [Ms.] Carter instead of employing metal detectors."[93] Thus, "[Deputy Monroe] is not entitled to claim state personnel immunity for Counts Six through Eleven."[94]

Likewise, Deputy Monroe's claim of public official immunity must fail. Common law public official immunity is reserved for public officials (as opposed to mere employees) who perform negligent acts during the course of their discretionary (as opposed to ministerial duties).[95] The State Defendants have not presented any evidence that they are public officials as opposed to "mere employees." Moreover, even assuming, *arguendo,* that the State Defendants were public officials and also assuming, arguendo, that the security screening of visitors to the Circuit Court was a discretionary act, common law public official immunity would still not apply due to Deputy Monroe's intentional acts.[96] As noted above, Judge Brendar expressly found that based on the facts presently before this Court, that Deputy Monroe engaged in conduct either with malice or gross negligence. Based on Ms. Carter's vehement protests to Deputy Monroe using a metal detecting wand and Deputy Monroe's insistence that he use the metal detecting wand and his eventual use of the metal detecting wand, it is clear that Deputy Monroe's actions were intentional and that he does not qualify for common law public official immunity.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

---

[91] *Barbre v. Pope*, 935 A.2d 699, 717 (2007).
[92] ECF No. 32 at pg. 16.
[93] *Id.*
[94] *Id.*
[95] *See* James v. Prince George's County, 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980).
[96] *See Lee v. Cline*, 384 Md. 245, 258 (2004).

## B.   THE STATE DEFENDANTS DENIED THE PLAINTIFF MEDICAL CARE.

On both November 17, 2011, and March 28, 2012, the State Defendants manifestly failed to provide Ms. Carter with medical care. In fact, following the November 17, 2011, incident, the State Defendants never even so much as filed a report detailing Ms. Carter's injuries. Similarly, following the March 28, 2012, incident, the State Defendants simply returned to screening more Circuit Court visitors, never reported the incident to a supervisor, and no aid was rendered until Honorable Yvette M. Bryant called Defendant Rheumottom.[97]

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

## V.   THERE IS PLENTY OF EVIDENCE TO SUPPORT THE PLAINTIFF'S BATTERY CLAIM AND DEPUTY MONROE CERTAINLY DOES NOT ENJOY STATE PERSONNEL IMMUNITY.

Judge Brendar found that "Ms. Carter had asserted specific factual content for the Court to infer that [Deputy Monroe] committed the attempted-battery form of assault on Ms. Carter."[98] Again, the facts underlying Ms. Carter's claims are the same as they were when Judge Brendar adjudicated the State Defendants' Motion to Dismiss and, as discussed above, Ms. Carter has presented sufficient evidence to support all of her allegations. The State Defendants again contended in their Motion for Summary Judgment as they did in their Motion to Dismiss that Ms. Carter was not touched, and therefore no battery occurred. Judge Brendar disposed of the State Defendants' argument in his Memorandum, stating that "it is not unreasonable to infer that causing an electrical shock to someone may be regarded as a battery whether or not John Doe 3 ever laid a hand on her."[99] Additionally, the State Defendants make the same tired argument that Medtronic sanctioned the use of metal detectors on patients with implanted neurotransmitters, which Ms. Carter has addressed fully above. Since there is evidence to support a battery claim against Deputy Monroe, he cannot enjoy state personnel immunity because of the presence of malice.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

---

[97] Exhibit B at pg. 29, No. 1.
[98] ECF No. 32 at pg. 17.
[99] *Id.*

**VI.    DEPUTIES PRICE AND BEVERLY HAVE BEEN SUED FOR THEIR ACTIONS AND INACTIONS UNDERLYING THE PLAINTIFF'S CLAIMS.**

Ms. Carter has recently substituted Deputy Martin Price for John Doe #1 and Deputy Patrick Beverly for John Doe #2 (*hereinafter,* the "Replaced Deputies"). As confirmed both by the deposition testimony of the Replaced Deputies' and by the Replaced Deputies work schedules, the Replacement Deputies were scheduled to work and presumably did work as scheduled on November 17, 2011, and March 28, 2012, respectively. Curiously, however, after testifying that their scheduling assignments were indeed correct and authenticating their signatures that were affixed next to their assignments, the Replacement Deputies both testified that they were not at their assigned posts and that neither were present for either event involving Ms. Carter.

Additionally, due to the State Defendants' destruction of the video surveillance footage that would have either confirmed or refuted the Replaced Deputies' self-serving testimony -  that they were not posted where they were scheduled to be posted - there remains a dispute of material facts insofar as the Replacement Deputies have authenticated their signatures on their work schedules, but now conveniently claim that in spite of the personally authenticated documentary evidence, they both were somewhere else, but neither knows where.

Lastly, since the Replaced Deputies are now claiming that they cannot be trusted insofar as they regularly affix their signature to assignment schedules and then do not work their assigned posts, a jury should be permitted to evaluate the Replaced Deputies' credibility and make a factual finding as to whether the Replaced Deputies were lying then or whether they are lying now.

For these reasons and the reasons set forth more fully in the body of this Opposition to the Defendants' Motion for Summary Judgment, the Defendants' Motion for Summary Judgment must be denied in its entirety.

### *CONCLUSION*

Under motion for summary judgment standards, as a matter of fact and law, Ms. Carter has sufficiently proven each and every one of the claims that the State Defendants could possibly have been attacking in their Motion for Summary Judgment.

For these reasons and the reasons set forth more fully in the body if this Memorandum of Law, the State Defendant's Motion for Summary Judgment must be denied in its entirety and the Opinion of this Court should be published to correct any  confusion on the part of the State of Maryland in the future.

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, P.C.**

*Charles H. Edwards IV*
_____
Charles H. Edwards IV
Law Offices of Barry R. Glazer
P.O. Box 27166
1010 Light Street
Baltimore, Maryland 21230
(410) 547-8568
Bar Roll No.: 29977
*Attorney for Plaintiff*

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, this 9th Day of March, 2015, I electronically filed with this Honorable Court a copy of the Plaintiff's Opposition to the Defendants' Motion for Summary Judgment. All parties to this action have been alerted to this filing either by the Court's electronic filing system or through United States Postal Service, First Class Mail, postage prepaid.

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, P.C.**

*Charles H. Edwards IV*

_____
Charles H. Edwards IV
Law Offices of Barry R. Glazer
P.O. Box 27166
1010 Light Street
Baltimore, Maryland 21230
(410) 547-8568
Bar Roll No.: 29977
*Attorney for Plaintiff*