IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| LINDA CARTER, | * |
| Plaintiff, | * |
| v. | * Case No. BPG-12-1789 |
| STATE OF MARYLAND, et al. | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

The above-referenced case was referred to the undersigned for all proceedings with the consent of the parties (ECF Nos. 40, 41), pursuant to 28 U.S.C. 636(c) and Local Rule 301.4. (ECF No. 36.) Currently pending is Defendants' Motion for Summary Judgment ("Motion") (ECF No. 102), plaintiff's Opposition to the Defendants' Motion for Summary Judgment ("Opposition") (ECF No. 119), and Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (ECF No. 121). Oral argument was held before the undersigned on June 18, 2015. For the reasons discussed herein, Defendants' Motion for Summary Judgment (ECF No. 102) is GRANTED.

**I.     Background**

The following is a summary of the evidence in this case, viewed in the light most favorable to plaintiff.[1] In 2006, plaintiff Linda Carter ("plaintiff") underwent spinal fusion surgery for two herniated disks in her back. (Pl.'s Depo., Pl.'s Ex. A at 24:21-26:5.) Due to complications arising from the first surgery, plaintiff underwent a second spinal fusion a year

---

[1] Unless otherwise noted, specifically, when the video evidence conflicts, the evidence discussed is plaintiff's version of events.

later. (Id. at 27:2-30:9.) Because plaintiff continued to experience nerve pain, it was recommended that she have a Medtronic neurostimulator implanted in the middle of her back. (Id. at 32:2-33:9, 34:16-35:6.) The neurostimulator alleviates plaintiff's pain by providing stimulation to plaintiff's left leg. (Id. at 33:18-34:1.) After the device was implanted, Medtronic provided plaintiff with information advising her how to operate the device, including how to navigate security screening devices and theft detectors. (Id. at 37:21-38:21, 40:13-41:16.) Medtronic also provided plaintiff with an identification card which states the following: "I have an implanted medical device that may set off your airport security system." (ECF No. 102-4.)

The instant lawsuit arises out of plaintiff's claims that she was injured during security screenings at the Circuit Court for Baltimore City (the "courthouse") on November 17, 2011 and March 28, 2012. Plaintiff states that one month prior to the November 2011 incident, she called the "Civil Liberties" office at the courthouse and advised an unknown woman that, because of her neurostimulator implant, she did not want to walk through the metal detector at the courthouse. (Pl.'s Depo., Pl.'s Ex. A at 53:6-55:3.) The woman assured plaintiff that she would be permitted to walk past the metal detector if she presented her Medtronic identification card. (Id. at 55:3-7.)

On November 17, 2011, plaintiff arrived at the courthouse at approximately 9:00 a.m. and entered through the side door. (Id. at 56:5-13.) Upon approaching the security checkpoint, plaintiff presented her Medtronic identification card to an unknown deputy,[2] and advised that she could not walk through the metal detector. (Id. at 59:14-17, 66:2-8.) The deputy directed plaintiff to walk along the outside of the metal detector, to which plaintiff responded that she was "going to try." (Id. at 59:14-17, 66:10-13.) According to plaintiff, she felt a burning sensation in

---

[2] Plaintiff has sued Deputy Martin Price ("Deputy Price") and Deputy Patrick Beverly ("Deputy Beverly") for the November 2011 incident. As discussed below, however, plaintiff has failed to identify a factual dispute regarding their liability.

2

her leg when she had walked "almost past" the metal detector. (Id. at 59:17-19, 66:16-17, 67:10-12.) Plaintiff screamed, and the deputy threw a chair under her. (Id. at 59:19-21, 67:19-68:2.) Plaintiff states that she remained seated for a few minutes, and then took the elevator upstairs to attend her divorce proceeding. (Id. at 69:21-70:17.) Plaintiff left the courthouse without notifying any courthouse personnel of her alleged injury, and did not file a report anytime thereafter. (Id. at 74:17-21, 90:18-20.)

Following the November 2011 incident, plaintiff sought medical treatment in January 2012. (Id. at 76:7-10.) Plaintiff's treating physician described what happened to plaintiff in the courthouse as "odd," and suggested that she meet with a Medtronic technician. (Id. at 79:21-80:8.) The technician recalibrated plaintiff's neurostimulator implant, which provided plaintiff minimal relief from her pain. (Id. at 81:8-83:19.)

On March 27, 2012, the day before the second alleged incident, plaintiff visited the courthouse to deliver financial documents. (Id. at 88:10-15.) Plaintiff entered the courthouse through the main entrance, presented her Medtronic identification card to Deputy Christian Smith ("Deputy Smith"), and advised that she could not walk through the metal detector because she had been electrocuted in November 2011. (Id. at 88:21-89:3, 90:1-6.) Deputy Smith instructed plaintiff to walk around the metal detector, and she did so without complication. (Id. at 89:5-9.)

On March 28, 2012, the day of the second alleged incident, plaintiff claims that she entered the courthouse through the main entrance and was instructed by Deputy Smith to walk around the metal detector. (Id. at 91:6-8.) Plaintiff also claims that Deputy Smith handed plaintiff's coat to Deputy Freddie Monroe ("Deputy Monroe"), and instructed Deputy Monroe to "[j]ust check [plaintiff's] coat." (Id. at 91:8-12.) Next, plaintiff alleges that Deputy Monroe

placed plaintiff's coat on the security desk and grabbed the handheld security wand. (Id. at 92:20-21.) At that point, as plaintiff was facing Deputy Monroe, she raised her hands in the hair, informed Deputy Monroe that she could not be subjected to the handheld wand, and asked for a female deputy. (Id. at 93:2-10, 94:16-95:6.) As plaintiff turned around to get her coat, she claims that Deputy Monroe waved the handheld security wand down the left side of her body, but did not make any physical contact. (Id. at 95:16-18, 96:7-97:4.) Thereafter, plaintiff felt a "jolt" in her left leg and started to fall, but Deputy Smith caught her and placed her in a chair behind the security desk. (Id. at 96:17-19, 97:5-8, 99:7-21.) According to plaintiff, after she left the security checkpoint, she told another unknown deputy that she had been electrocuted, and he escorted her to her assigned courtroom. (Id. at 101:2-20.) After plaintiff's hearing was completed, the incident was reported to the presiding judge, and the paramedics were called. (Id. at 102:7-104:13.) Plaintiff was transported to the hospital, received medical treatment, and was released the same day. (Id. at 105:11-106:19.)

Defendants have produced video evidence of the March 2012 incident,[3] which shows plaintiff entering the courthouse, and, after speaking with Deputy Smith and pointing towards the metal detector, removing her coat and walking along the outside of the metal detector. (Defs.' Ex. 5 at 9:22:40-9:23:00.) Plaintiff subsequently hands her coat to Deputy Monroe, who places the coat on the security desk. (Id. at 9:23:03-9:23:11.) Thereafter, as plaintiff turns to face Deputy Monroe after picking up her coat, Deputy Monroe attempts to approach plaintiff with a handheld security wand. (Id. at 9:23:14-9:23:17.) Before Deputy Monroe can use the handheld wand, however, plaintiff steps backwards and away from him while bending forward. (Id. at 9:23:15-9:23:20.) Plaintiff remains bent over for nearly one minute before she walks away from

---

[3] Video evidence of the November 2011 incident is unavailable, as it was deleted in accordance with defendants' retention policy. (See ECF No. 106.)

the security checkpoint and is no longer visible on the video footage. (Id. at 9:23:20-9:24:06.) During that time, plaintiff seemingly has a conversation with Deputy Monroe, and can once again be seen pointing to the metal detector. (Id. at 9:23:20-9:23:55.)

The undersigned notes that there are discrepancies between plaintiff's testimony regarding the March 2012 incident and the video evidence produced by defendants. First, through her testimony, plaintiff suggests that Deputy Monroe used the handheld security wand despite plaintiff's objections. Upon review of the video evidence, however, Deputy Monroe appears to refrain from using the wand as soon as plaintiff backs away from him. Further, although plaintiff alleges that Deputy Monroe waved the handheld security wand down the left side of her body, this action is not visible in the video. Rather, Deputy Monroe appears to simply approach plaintiff with the wand raised. Finally, in the video, plaintiff does not fall and Deputy Smith does not catch her, after she is allegedly injured.

Plaintiff filed this lawsuit in the Circuit Court for Baltimore City in June 2012 against the Mayor and City Council of Baltimore City (the "City"); the State of Maryland; Beverly Carter, Court Administrator for the Circuit Court for Baltimore City; John Anderson, Sheriff of Baltimore City; Donald Rheubottom, a captain in the Sheriff's Office of Baltimore City; John and Jane Does 1-20, Deputy Sheriffs and/or Court House Security Officers; and Richard and Jane Roes 1-20, supervisors of John and Jane Does 1-20 (collectively, the "State defendants"). (ECF No. 3.) After the case was removed to this court (ECF Nos. 1, 2), all defendants moved to dismiss plaintiff's Amended Complaint (ECF No. 17)[4] for failure to state a claim. Judge Bredar

---

[4] On October 3, 2014, the undersigned granted as unopposed plaintiff's Motion to Amend by Interlineation. (ECF No. 91.) Deputies Price, Beverly, and Monroe replaced John Does 1, 2, and 3, respectively.

granted the City's motion to dismiss (ECF No. 19), and granted in part and denied in part the State defendants' motion to dismiss (ECF No. 18).[5]

The claims remaining against the State defendants are as follows: (1) violation of Title II of the Americans with Disabilities Act ("ADA") (all defendants in their official capacities); (2) violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") (all defendants in their official capacities); (3) violation of due process under 42 U.S.C. § 1983 (Deputies Price, Beverly, and Monroe in their individual capacities); (4) violation of Articles 19 and 24 of the Maryland Declaration of Rights (Deputy Monroe, in his individual capacity); (5) negligence (Deputy Monroe, in his individual capacity); (6) assault and battery (Deputy Monroe, in his individual capacity); and (7) *respondeat superior* (State of Maryland).

## II.     Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is properly considered "material" only if it might affect the outcome of the case under the governing law. Id. The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); Pulliam Inv. Co., Inc. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987). On those issues for which the non-moving party will have the burden of proof, however, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in Federal Rule of

---

[5] The undersigned notes that throughout her Opposition, plaintiff cites abundantly to Judge Bredar's Memorandum (ECF No. 32) ruling on defendants' motions to dismiss, rather than citing to any relevant and material evidence of record. Plaintiff's reliance on Judge Bredar's ruling is misplaced, as the court is obligated at this stage to consider the evidence, rather than merely assume the truth of the allegations in the pleadings.

Civil Procedure 56. Fed. R. Civ. P. 56(c); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

When reviewing a motion for summary judgment, the court does not evaluate whether the evidence favors the moving or non-moving party, but considers whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented. Anderson, 477 U.S. at 252. In undertaking this inquiry, the court views all facts and makes all reasonable inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-moving party, however, may not rest on its pleadings, but must show that specific, material facts exist to create a genuine, triable issue. Celotex, 477 U.S. at 324. A "scintilla" of evidence in favor of the non-moving party, however, is insufficient to prevent an award of summary judgment. Anderson, 477 U.S. at 252. Further, "mere speculation" by the non-moving party or the "building of one inference upon another" cannot create a genuine issue of material fact. Cox v. Cnty. of Prince William, 249 F.3d 295, 299-300 (4th Cir. 2001). Summary judgment should be denied only where a court concludes that a reasonable jury could find in favor of the non-moving party. Anderson, 477 U.S. at 252.

**III.   Discussion**

   **A. ADA and Rehabilitation Act Claims (Counts Three and Four against all defendants)**

Plaintiff alleges that defendants violated the ADA and Rehabilitation Act during plaintiff's visits to the courthouse in November 2011 and March 2012. (Pl.'s Am. Compl. ¶¶ 65-80, ECF No. 17 at 21-24.) Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

7

benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C.A. § 12132 (West 2014). Similarly, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C.A. §794(a) (West 2014). To prevail on her ADA and Rehabilitation Act claims, plaintiff must demonstrate (1) that she has a disability; (2) that she is qualified to receive the benefit of a service, program, or activity of a public entity; and (3) that she was excluded from such a benefit, or was otherwise discriminated against on the basis of her disability. Baird v. Rose, 192 F.3d 462, 467-70 (4th Cir. 1999).[6]

The parties agree that plaintiff has a disability and is qualified to receive the benefit of a public entity. (ECF No. 102-1 at 19; ECF No. 119 at 23.) The parties disagree, however, as to whether plaintiff was excluded from a benefit or was otherwise discriminated against. With regard to this third element, there are three distinct grounds upon which relief may be granted: (1) intentional discrimination or disparate treatment; (2) disparate impact; or (3) failure to make reasonable accommodations. Adams v. Montgomery College, 834 F. Supp. 2d 386, 393 (D.Md. 2011). Compensatory damages may be awarded for a public entity's failure to make reasonable accommodations if the public entity "intentionally or with deliberate indifference fail[ed] to provide meaningful access or reasonable accommodation" to the disabled plaintiff. Id. (internal citations and quotation marks omitted). A public entity intentionally violates the ADA or

---

[6] A plaintiff seeking recovery under the Rehabilitation Act must also "demonstrate that the [public entity] at issue receives federal funding." Paulone v. City of Frederick, 787 F. Supp. 2d 360, 371 (D.Md. 2011). The undersigned need not address whether defendants received federal funding, as there is no genuine issue of material fact regarding the remaining elements of plaintiff's claim. Accordingly, summary judgment for defendants on plaintiff's Rehabilitation Act claim is proper.

Rehabilitation Act when it clearly and knowingly refuses an accommodation, despite having notice of the potential risk of that decision. Id. at 394 (internal citation omitted).

Plaintiff argues that defendants failed to reasonably accommodate her when she entered the courthouse in November 2011 and March 2012, and that such failure was the product of defendants' deliberate indifference. (ECF No. 119 at 24, 26.) Specifically, plaintiff asserts that because she presented her Medtronic identification card and advised that she could not walk through the metal detector, defendants had notice of the potential risks associated with plaintiff's neurostimulator implant. (Id. at 26.) Defendants, however, argue that plaintiff was reasonably accommodated on both occasions because she was not required to walk through the metal detector. (ECF No. 102-1 at 19.) Defendants emphasize that in November 2011, plaintiff was permitted to walk along the outside of the metal detector after presenting her Medtronic identification card and advising that she could not walk through the metal detector. (ECF No. 121 at 2.) With respect to the March 2012 incident, defendants maintain that plaintiff was not required to walk through the metal detector and that Deputy Monroe did not actually use the handheld security wand on plaintiff. (ECF No. 102-1 at 20-21; ECF No. 121 at 7.) Additionally, defendants claim that they did not display deliberate indifference on either occasion because they acted in accordance with their training and Medtronic's instructions. (ECF No. 102-1 at 20.)

With respect to the November 2011 incident, the undersigned concludes that there is no genuine issue of material fact regarding defendants' deliberate failure to reasonably accommodate plaintiff. First, there is no evidence that defendants failed to accommodate plaintiff. According to plaintiff, she presented her Medtronic identification card, advised that she could not walk through the metal detector, and agreed to the deputy's instruction to walk around the metal detector instead. (Pl.'s Depo., Pl.'s Ex. A at 59:14-17, 66:2-11.) The record is devoid

of evidence that plaintiff objected to the deputy's accommodation or requested a different accommodation. Further, plaintiff has not identified any evidence that defendants acted with deliberate indifference. Plaintiff argues that squeezing along the outside of the metal detector presented the "same dangers" as walking through it, and that defendants were aware of that risk because plaintiff presented her Medtronic identification card. (ECF No. 119 at 25-26.) Plaintiff's identification card, however, merely advises that her device may set off a metal detector. (ECF No. 102-4.) It does not instruct how to accommodate plaintiff's disability, or provide warnings associated with the device. (Id.) Consequently, defendants did not have notice that plaintiff could be injured by walking along the outside of the metal detector. In sum, there is no evidence of record that defendants violated the ADA or the Rehabilitation Act in November 2011.

The undersigned also concludes that there is no genuine issue of material fact regarding defendants' deliberate failure to reasonably accommodate plaintiff in March 2012. At oral argument, plaintiff's counsel asserted that because defendants knew plaintiff could not walk through the metal detector, they should have known that plaintiff could not be subjected to the use of a handheld security wand.[7] Plaintiff has produced no evidence, however, to support this proposition. In addition, plaintiff's counsel argued that according to courthouse policy, plaintiff should have been patted down if she objected to walking through the metal detector. To the contrary, as explained by Deputies Monroe and Smith, courthouse policy dictates that when an individual presents a medical card excusing her from walking through the metal detector, that individual may be subjected to the handheld security wand or a pat down. (Monroe Depo., Pl.'s Ex. E at 46:5-8; Smith Depo., Pl.'s Ex. D at 29:15-31:10.) Both deputies testified, that unless the

---

[7] For the purposes of this opinion, the undersigned assumes that Deputy Monroe used the handheld security wand as plaintiff claims, although, it is quite clear that the video evidence does not show him doing so.

individual objects to the use of the handheld security wand, it is appropriate to screen the individual with the wand. (Monroe Depo., Pl.'s Ex. E at 46:12, 66:6-10; Smith Depo., Pl.'s Ex. D at 31:6-10.) Plaintiff has not maintained, however, that she objected to the handheld security wand prior to her interaction with Deputy Monroe. Additionally, Medtronic, the manufacturer of plaintiff's neurostimulator implant, advises that "[s]ecurity personnel may use a handheld security wand" as long as they are asked "not to hold the security wand near the neurostimulator any longer than is needed." (ECF No. 102-3 at 5.) Indeed, plaintiff acknowledged that she received this information when her neurostimulator was implanted. (Pl.'s Depo., Pl.'s Ex. A at 50:15-19.) There is no evidence in the record supporting plaintiff's assertion that defendants should have known that the use of a handheld security wand was not a reasonable accommodation. Defendants' actions were consistent with both the training they received and with Medtronic's instructions.

In addition, the record is completely devoid of any evidence that the deputies intentionally violated the ADA or the Rehabilitation Act in March 2012 by "knowingly refusing to accommodate [plaintiff], despite having notice of the potential risk." Adams, 834 F. Supp. 2d at 394. There is no evidence that the deputies knew of any risk associated with the use of a handheld security wand. Neither plaintiff's interactions with the deputies, or plaintiff's Medtronic identification card,[8] put the deputies on notice of that risk. Both deputies testified that unless plaintiff objected, courthouse policy permitted the deputies to use the handheld security wand after plaintiff bypassed the metal detector. (Monroe Depo., Pl.'s Ex. E at 66:6-10; Smith Depo., Pl.'s Ex. D at 30:2-20.) Plaintiff has not offered any evidence that she objected to the handheld security wand prior to her interaction with Deputy Monroe. Rather, plaintiff testified

---

[8] For the purposes of this opinion, I will assume, although it is not depicted on the video evidence, that plaintiff presented her card to the deputies.

11

that she objected *after* Deputy Monroe grabbed the wand and began to approach her. (Pl.'s Depo., Pl.'s Ex. A at 94:19-95:20.) At that point, the video evidence clearly shows that Deputy Monroe stopped approaching plaintiff and did not actually use the handheld security wand. (Defs.' Ex. 5 at 9:23:15-9:23:25.) In sum, there are no genuine issues of material fact regarding defendants' failure to accommodate plaintiff, or, even if there was such a failure, that it was intentional or with deliberate indifference. Accordingly, defendants' summary judgment motion is granted as to plaintiff's ADA and Rehabilitation Act claims.

## B. Due Process Claim (Count Five against Deputies Price, Beverly, and Monroe)

Plaintiff claims that her Fourteenth Amendment due process rights were violated when defendants denied her access to the court in November 2011 and March 2012. (Pl.'s Am. Compl. ¶¶ 81-87, ECF No. 17 at 24-25.) The Due Process Clause of the Fourteenth Amendment protects an individual's right to access the courts. Lane v. Tennessee, 315 F.3d 680, 682 (6th Cir. 2003). In the context of civil litigation, this means the parties have the right to be present in the courtroom and to meaningfully participate in the process. Id. Plaintiff claims that because defendants severely injured her as she attempted to maneuver through the security screening process, she was denied access to the court in both November 2011 and March 2012. (ECF No. 119 at 32-33.) In particular, plaintiff argues that she was unable to meaningfully participate in her divorce proceedings because her neurostimulator was repeatedly shocking her and was not functioning properly because it had been damaged by defendants. (Id. at 32.) There is no evidence to support plaintiff's claim that defendants denied her access to the court on either occasion. As discussed above, upon entering the courthouse and informing security personnel that she could not pass through the metal detector, plaintiff was instructed to pass around it. Even assuming that defendants used the handheld security device on plaintiff, there is no

evidence supporting the suggestion that defendants should have known that use of the wand would result in injury to plaintiff.  On the contrary, defendants reasonably accommodated plaintiff's disability and took no steps to prevent her from attending and participating in her court proceedings.  In following their own procedures, as well as the instructions of Medtronic, defendants did not take any action that they reasonably could have known would cause an injury to plaintiff or interfere with her ability to participate in her court proceedings.  Accordingly, defendants' motion for summary judgment as to plaintiff's due process claim must be granted.

Alternatively, Deputy Monroe argues that he cannot be held liable because he is entitled to qualified immunity.  (ECF No. 102-1 at 23-24.)  Plaintiff asserts that the doctrine of qualified immunity does not apply to the facts presented.  (ECF No. 119 at 27-28.)  Government officials are entitled to qualified immunity in the performance of their discretionary functions, so long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The qualified immunity defense is available to a government official if (1) the plaintiff has not alleged facts establishing that a constitutional right was violated, or (2) the constitutional right at issue was not "clearly established" when it was allegedly violated.  Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 395-96 (4th Cir. 2014) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  As discussed herein, there is no evidence of a violation of plaintiff's constitutional rights.  Accordingly, Deputy Monroe is entitled to qualified immunity.

Finally, although deputies Beverly and Price claim they are entitled to qualified immunity for the November 2011 incident, they assert that the court need not address that issue because they have been improperly sued.  (ECF No. 102-1 at 23 n.9.)  Specifically, deputies Beverly and Price claim to have no liability for the injuries plaintiff allegedly sustained in November 2011,

because neither was present at the security checkpoint when plaintiff entered the courthouse. (Id. at 18.) Plaintiff emphasizes the fact that deputies Beverly and Price signed a work schedule acknowledging their assignment to the courthouse entrance post on the date in question. (ECF No. 119 at 37.) Both deputies explained, however, that they are frequently assigned to one post and relocated to another post by their supervisors. (Price Depo., ECF No. 102-5 at 7:7-10; Beverly Depo., ECF No. 102-8 at 7:15-21, 10:21-11:2.) Deputy Beverly further explained that the deputies sign the schedule the night before they are scheduled to work so they know what time to arrive in the morning. (Beverly Depo., ECF No. 102-8 at 8:1-6.) The schedule, therefore, does not necessarily reveal what post a deputy actually worked on a particular day. Finally, both deputies indicated that they did not recall interacting with plaintiff, and plaintiff has failed to produce evidence of her ability to identify either deputy as being present on the day in question. (Id. at 9:17-19; Price Depo., ECF No. 102-5 at 5:2-7.)[9] Accordingly, deputies Beverly and Price are entitled to summary judgment, as plaintiff has provided no evidence that either deputy was involved in the alleged incident.

### C. State Constitutional Claims (Count Six against Deputy Monroe)

Plaintiff's Amended Complaint alleges that Deputy Monroe violated Articles 19 and 24 of the Maryland Declaration of Rights when he used the handheld wand on plaintiff on March 28, 2012. (Pl.'s Am. Compl. ¶¶ 88-96, ECF No. 17 at 26-27.) Preliminarily, it must be noted that the Maryland Court of Appeals has concluded that "Article 19 of the Maryland Declaration of Rights does not necessarily support a private cause of action and monetary remedies. Dehn Motor Sales, LLC v. Schultz, 439 Md. 460, 486 n.27 (2014). Rather, Article 19 "guarantees a citizen the opportunity to seek judicial redress of a wrong." Id. Accordingly, Count Six of

---

[9] In reply to their Motion, defendants also assert that plaintiff was present at the depositions for deputies Beverly and Price, and confirmed off the record that she did not recognize either individual. (ECF No. 121 at 11-12.)

plaintiff's Amended Complaint appears to focus on the alleged violation of Article 24 of the Maryland Declaration of Rights.

Article 24 provides that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."  Md. Const. art. XXIV.  To prevail on her Article 24 claim, plaintiff must establish (1) that Deputy Monroe engaged in activity that violated one of plaintiff's constitutional rights, and (2) that Deputy Monroe engaged in such conduct with actual malice.  Davis v. DiPino, 99 Md. App. 282, 289 (1994), *rev'd on other grounds*, 337 Md. 642 (1995).  Malicious conduct is that which is performed not with "legal justification or excuse," but rather "with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff."  Id. at 290-91 (internal citation and quotation marks omitted).

Plaintiff has failed to produce evidence to establish either element of her claim.  As discussed above, as to the first element, plaintiff has failed to demonstrate that she was denied access to the court in March 2012.  Even if there was evidence as to this element, there is no evidence that Deputy Monroe acted with actual malice.  According to plaintiff, she did not request a female deputy to conduct a pat-down until *after* Deputy Monroe began to approach her with the handheld security wand.  (Pl.'s Depo., Pl.'s Ex. A at 93:8, 96:6-7.)  Further, the video evidence reveals that as soon as plaintiff protested, Deputy Monroe stepped away from her and did not persist in his attempt to screen her with the wand.  (Defs.' Ex. 5 at 9:23:15-9:23:25.)  There is absolutely no evidence of malicious conduct by Deputy Monroe.  Accordingly, because plaintiff has failed to establish either element of her Article 24 claim, summary judgment for Deputy Monroe on that claim is warranted.

### D. Negligence Claim (Count Ten against Deputy Monroe)

Plaintiff alleges that Deputy Monroe was negligent in failing to provide her with medical care in March 2012. (Pl.'s Am. Compl. ¶¶ 116-19, ECF No. 17 at 32-33.) Specifically, plaintiff argues that Deputy Monroe failed to provide her with medical attention, failed to report the alleged incident to a supervisor, and failed to file a report detailing plaintiff's injuries. (ECF No. 119 at 36.) To establish a claim for negligence, plaintiff must prove that Deputy Monroe owed her a duty, that he breached that duty, and that he proximately caused plaintiff to suffer actual injury or loss. Pendleton v. State, 398 Md. 447, 460 (2007).

First, plaintiff has failed to establish that Deputy Monroe owed plaintiff a duty to provide her with medical care. Second, assuming Deputy Monroe did have such a duty, plaintiff has failed to demonstrate that Deputy Monroe breached his duty. The evidence reveals that Deputy Monroe did in fact file a report following the March 2012 incident. (ECF No. 102-9 at 1-2.) The report states that plaintiff declined Deputy Monroe's offer to call a medic unit. (Id. at 1.) In addition, plaintiff's deposition testimony confirms that she wanted to attend her divorce proceeding before obtaining medical assistance. (Pl.'s Depo., Pl.'s Ex. A at 100:17-101:5.) There is no evidence that Deputy Monroe negligently failed to provide plaintiff with medical care, and, therefore, summary judgment on plaintiff's negligence claim against Deputy Monroe is appropriate.

### E. Assault and Battery Claim (Count Eleven against Deputy Monroe)

Plaintiff's Amended Complaint alleges that Deputy Monroe committed an assault and battery on her in March 2012. (Pl.'s Am. Compl. ¶¶ 120-24, ECF No. 17 at 34-35.) An assault is an "attempt to cause a harmful or offensive contact" with another person. Continental Cas. Co. v. Mirabile, 52 Md. App. 387, 398 (1982). A battery is an actual harmful or offensive

contact which results "from an act intended to cause . . . such contact." Saba v. Darling, 320 Md. 45, 49 (1990). Although the intent requirement for a battery is general, as opposed to specific, "a purely accidental touching, or one caused by mere inadvertence, is not enough to establish" a battery claim. Nelson v. Carroll, 355 Md. 593, 602 (1999). In other words, "innocent conduct that accidentally or inadvertently results in a harmful or offensive contact with another will not give rise to liability" for battery. Id. at 603.

Plaintiff claims that Deputy Monroe committed a battery when he shocked plaintiff with the handheld security wand, despite the fact that he never made contact with plaintiff's body. (ECF No. 119 at 36.) Defendants, however, argue that no battery was committed, as Deputy Monroe did not make physical contact with plaintiff's body, or intend to injure her or cause an offensive contact. (ECF No. 102-1 at 29.) Indeed, the video evidence of the March 2012 incident shows that Deputy Monroe never made physical contact with plaintiff's body. (Defs.' Ex. 5 at 9:23:00-9:23:17.) Nonetheless, although Deputy Monroe could have committed a battery by simply waving the handheld security wand near plaintiff's body, plaintiff has provided no evidence that Deputy Monroe intended to cause a "harmful or offensive contact."[10] Deputy Monroe testified that he was merely complying with courthouse procedure when he attempted to screen plaintiff with the handheld security wand. (Monroe Depo., Pl.'s Ex. E at 46:5-8.) There is no evidence that Deputy Monroe, prior to approaching plaintiff, had any notice that his conduct would result in a harmful or offensive contact. Moreover, the video evidence reveals that Deputy Monroe did not continue to approach plaintiff once she objected to the wand. (Defs.' Ex. 5 at 9:23:15-9:23:25.) Plaintiff has not shown that Deputy Monroe intentionally caused, or even attempted to cause, plaintiff to be shocked by the handheld security wand.

---

[10] For these same reasons, plaintiff's assault claim must fail.

Accordingly, because plaintiff has failed to create a factual issue regarding Deputy Monroe's liability for assault and battery, summary judgment for defendant on this claim is appropriate.

### F. Common Law and Statutory Immunity

Even if summary judgment for Deputy Monroe was not appropriate on plaintiff's negligence and assault and battery claims, Deputy Monroe is entitled to common law public official immunity on plaintiff's negligence claim, and statutory state personnel immunity on plaintiff's negligence and assault and battery claims. (ECF No. 102-1 at 27-29.) Plaintiff argues that Deputy Monroe is entitled to neither form of immunity, because he acted maliciously when he screened plaintiff. (ECF No. 119 at 34-35.) Public official immunity is available to (1) a public official who, (2) performed a discretionary, as opposed to ministerial, act in furtherance of his official duties. James v. Prince George's Cnty., 288 Md. 315, 323 (1980). If these elements are satisfied, the individual is immune from negligence claims filed against him, so long as his actions were performed without malice. Id. at 323-24.

Deputy Monroe satisfies the first element required for public official immunity, because a sheriff is a "public official." Duncan v. Koustenis, 260 Md. 98, 106 (1970) (citing Cocking v. Wade, 87 Md. 529, 540 (1989)). With regards to the second element, a discretionary function is one in which "the official has the freedom and authority to make decisions and choices." James, 288 Md. at 326. In other words, a discretionary duty involves the "freedom to act according to one's judgment in the absence of a hard and fast rule." Id. Courthouse policy permits a deputy to either conduct a pat down or use the handheld security wand when an individual is excused from walking through the metal detector. (Monroe Depo., Pl.'s Ex. E at 46:5-8; Smith Depo., Pl.'s Ex. D at 29:15-31:10.) When Deputy Monroe attempted to use the handheld security wand in March 2012, therefore, his conduct was discretionary in nature.

To be entitled to public official immunity, Deputy Monroe's actions must have also been performed without malice. "Malice" is defined as "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." Barbre v. Pope, 402 Md. 157, 182 (2007) (internal citation and quotation marks omitted). Plaintiff claims that Deputy Monroe displayed malice when he disregarded an instruction to provide a pat-down screening to plaintiff. (ECF No. 119 at 35.) As previously discussed, however, plaintiff did not request a pat-down screening prior to her encounter with Deputy Monroe. Rather, plaintiff requested a female deputy to conduct a pat-down only *after* Deputy Monroe began to approach plaintiff with the handheld security wand. (Pl.'s Depo., Pl.'s Ex. A at 93:8, 96:6-7.) Additionally, once plaintiff protested, Deputy Monroe did not continue to approach her with the wand. (Defs.' Ex. 5 at 9:23:15-9:23:25.) In sum, there is no evidence that Deputy Monroe acted with malice. Accordingly, Deputy Monroe is entitled to public official immunity, and, therefore, summary judgment, on plaintiff's negligence claim.

As to the issue of statutory state personnel immunity, pursuant to Maryland statute, "[s]tate personnel . . . are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." MD. CODE ANN., CTS. & JUD. PROC. § 5-522(b) (West 2015). As noted above, there is no evidence of malice. "Gross negligence" is "an intentional failure to perform a manifest duty in reckless disregard of the consequences . . . and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." Id. at 187. There is no evidence that Deputy Monroe acted with gross negligence; he had absolutely no notice that use of a handheld security device would have adverse consequences. Indeed, Deputy Monroe's actions were consistent with both defendants' internal

procedures and Medtronic's advice that a security wand not be held over a neurostimulator implant for an extended period of time. (ECF No. 102-3 at 5.) In sum, there is no evidence that Deputy Monroe acted with malice or gross negligence such that he is divested of his common law or state personnel immunity.

### G. *Respondeat Superior* Claim (Count Twelve against the State of Maryland)

Plaintiff's Amended Complaint includes a claim for *respondeat superior* against the State of Maryland, which alleges that the State is vicariously liable for the acts of the individual deputies. (Pl.'s Am. Compl. ¶¶ 125-30, ECF No. 17 at 35-36.) Defendant correctly asserts, however, that "*respondeat superior* is not a separate cause of action." Sterling v. Ourisman Chevrolet of Bowie, Inc., 943 F. Supp. 2d. 577, 601 (D.Md. 2013). Additionally, defendant argues that plaintiff has nonetheless abandoned her *respondeat superior* claim by failing to respond to the appropriate arguments raised in defendants' Motion. (ECF No. 121 at 12-13.) See Mentch v. Eastern Savings Bank, FSB, 949 F. Supp. 1236, 1247 (D.Md. 1997) (holding that plaintiff's harassment claim was abandoned for failure to address that claim in her opposition to defendant's summary judgment motion). Accordingly, because *respondeat superior* is not a separate cause of action, and plaintiff failed to respond to defendant's arguments, summary judgment for defendant State of Maryland on that claim is warranted.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 102) is GRANTED. A separate order will be issued.

Date:   8/17/15                                              /s/
                                                             Beth P. Gesner
                                                             United States Magistrate Judge